IN THE SUPREME COURT OF NORTH CAROLINA

No. 150A19

Filed 3 April 2020

IN THE MATTER OF: S.D.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 2 January 2019 by Judge Louis A. Trosch in District Court, Mecklenburg County. This matter was calendared for argument in the Supreme Court on 25 March 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Gretchen L. Caldwell, Associate County Attorney, for petitioner-appellee Mecklenburg County Department of Social Services, Youth & Family Services Division.*

*K&L Gates, LLP, by Sophie Goodman, for Guardian ad Litem.*

*Mercedes O. Chut for respondent-appellant father.*

ERVIN, Justice.

Respondent-father Jonathan K. appeals from an order entered by the trial court terminating his parental rights in his minor child, S.D.[1] After careful consideration of respondent-father's challenges to the trial court's termination order

---

[1] S.D. will be referred to throughout the remainder of this opinion as "Sarah," which is a pseudonym used to protect the identity of the juvenile and for ease of reading.

in light of the record and the applicable law, we conclude that the trial court's termination order should be affirmed.

In September 2016, the Mecklenburg County Department of Social Services, Youth and Family Services Division assumed responsibility for addressing concerns that Sarah might be a neglected juvenile from the Gaston County Department of Social Services. At that time, Sarah was in a kinship placement with a maternal great-aunt as the result of substance abuse and mental health problems involving her mother and her mother's boyfriend. After Sarah's mother tested positive for methamphetamines at the time that she gave birth to Sarah's half sibling on 30 November 2016, YFS filed a juvenile petition alleging that Sarah was a neglected and dependent juvenile and obtained nonsecure custody of her on 2 December 2016.[2] Sarah's placement with her great-aunt continued after she was taken into YFS custody.

At the time that YFS filed the juvenile petition and obtained nonsecure custody of Sarah, respondent-father was incarcerated in the custody of the Division of Adult Correction based upon convictions for possession of a firearm by a felon and felony drug-related offenses. Although YFS noted that respondent-father was Sarah's father in the juvenile petition, it also alleged that "[p]aternity ha[d] not been established" and that "[respondent-father] ha[d] never seen [Sarah] nor ha[d] he

---

[2] The juvenile petition also addressed the status of Sarah's newborn half sibling, who is not respondent-father's child.

provided any financial or emotional support to her." When a YFS social worker visited respondent-father in prison on 31 January 2017, respondent-father acknowledged that he had a history of substance abuse, requested paternity testing, and expressed a willingness to enter into a case plan and participate in remedial services in the event that he was determined to be Sarah's biological father. In the aftermath of this meeting, YFS proposed an initial Out-of-Home Family Services Agreement, pursuant to which respondent-father would be required, among other things, to complete an assessment through the Families in Recovery Stay Together program, maintain sobriety, follow any recommendations resulting from the FIRST assessment, maintain consistent contact with YFS and Sarah's guardian ad litem, complete parenting education, and demonstrate the skills that he had learned during parenting education in the course of his interactions with Sarah.

The juvenile petition came on for hearing before Judge David H. Strickland on 15 February 2017. Paternity of Sarah had not been established by the time of the hearing. In light of an agreement between the parties, which included stipulations to the existence of certain facts and indicated that "[respondent-father] ha[d] never seen [Sarah] nor ha[d] he provided any financial or emotional support to her[,]" Judge Strickland entered an order on 27 February 2017 in which he adjudicated Sarah to be a neglected and dependent juvenile, ordered that Sarah remain in YFS custody, and established reunification as the primary permanent plan, with adoption and guardianship being the concurrent secondary plan.

On 28 February 2017, respondent-father submitted to DNA testing. In addition, respondent-father was present for the first permanency planning review hearing on 11 May 2017 despite his continued incarceration. In the review hearing order that resulted from the 11 May 2017 hearing, Judge Strickland determined that respondent-father was Sarah's biological father based upon the results of the DNA test; ordered that respondent-father contact YFS immediately after his release in September 2017 so that he could begin working on his case plan; authorized respondent-father to send mail or gifts to Sarah through YFS, and noted that Sarah's great-aunt had authorized respondent-father to call her for the purpose of inquiring about Sarah's well-being.

Respondent-father sent a birthday card to Sarah prior to the next review hearing, which was held on 25 August 2017. In a review order entered on 18 September 2017, Judge Strickland established a plan under which respondent-father was allowed to visit with Sarah for two hours each week following his release from his incarceration in the event that he had demonstrated his ability to maintain sobriety by providing a clean drug screen to YFS. In addition, Judge Strickland changed Sarah's permanent plan to a primary plan of adoption and a concurrent secondary plan of legal guardianship and reunification on the grounds, among others, that respondent-mother had failed to make progress in satisfying the requirements of her case plan and the fact that respondent-father had remained incarcerated since the filing of the juvenile petition.

Respondent-father was released from prison on 21 September 2017. Between the date of his release and the next review hearing on 20 December 2017, respondent-father contacted YFS for the purpose of setting up a meeting to develop his case plan and to initiate a visitation program. However, respondent-father failed to appear on four scheduled meeting dates in October before finally meeting with a YFS representative on 21 November 2017. Although respondent-father expressed hesitation about participating in the case plan process, he agreed to complete a FIRST assessment. In spite of this agreement, respondent-father failed to complete the required FIRST assessment prior to the 20 December 2017 review hearing and had no further contact with YFS in advance of that hearing aside from a text message that he transmitted to a social worker on the date of the hearing indicating that he would be unable to attend. Similarly, even though respondent-father had contacted the maternal great-aunt on three separate occasions to set up a visit with Sarah, he never actually visited with his daughter.

In the order entered following the 20 December 2017 review hearing on 26 January 2018, the trial court ordered respondent-father to comply with the case plan that had been proposed by YFS, to obtain stable housing and employment, and to consistently visit with Sarah. In spite of the fact that it determined that respondent-father had failed to make significant progress toward complying with the provisions of his case plan, the trial court concluded that the initiation of a termination of parental rights proceeding at that time would not be in Sarah's best interests and

determined that respondent-father should be afforded "one more short review period to demonstrate significant progress . . . towards reunification." As a result, the trial court ordered respondent-father to "immediately demonstrate his commitment to reunifying with [Sarah] by taking affirmative action to comply with his case plan."

Although respondent-father visited with Sarah shortly after the 20 December 2017 review hearing, he otherwise failed to make significant progress toward satisfying the requirements of his case plan prior to the next review hearing, which was set for 20 February 2018. On the contrary, respondent-father was arrested for an alleged parole violation on 7 February 2018 and remained in custody until 12 February 2018. In view of the fact that respondent-father had failed to make significant progress in satisfying the provisions of his case plan by the time of the 20 February 2018 review hearing, the trial court concluded in the resulting order that termination of respondent-father's parental rights would be in Sarah's best interests and ordered YFS to make a filing seeking the termination of his parental rights in Sarah within the next sixty days. On the other hand, the trial court did not suspend efforts to reunify Sarah with respondent-father and allowed respondent-father to continue to visit with Sarah on the condition that, prior to his next visit, he provide a clean drug screen and meet with YFS for the purpose of discussing the provisions of his case plan. On 30 April 2018, YFS filed a motion seeking to have respondent-father's parental rights in Sarah terminated on the grounds of neglect and willfully leaving her in foster care or a placement outside the home for more than twelve

months without making reasonable progress toward correcting the conditions that had led to her removal from the home. N.C.G.S. § 7B-1111(a)(1) and (2) (2019).[3]

On 14 May 2018, respondent-father was arrested for possession of heroin, possession of methamphetamine, and possession of drug paraphernalia. In addition, respondent-father was charged with violating the terms and conditions of his parole on 15 May 2018 as a result of the fact that these new criminal charges had been lodged against him. Respondent-father remained incarcerated in connection with these new charges until he entered a plea of guilty to them on 5 September 2018, received a suspended sentence, and was released on probation.

After a continuance from a 25 July 2018 hearing date resulting from respondent-father's incarceration, another review hearing was held on 12 September 2018. On 21 November 2018, the trial court entered a review order finding that respondent-father had failed to make sustained efforts to comply with the provisions of his case plan or to make significant progress toward reunification with Sarah. In view of his failure to satisfy the requirements that had been established as a prerequisite for the reinstatement of visitation, respondent-father had not had any additional visits with Sarah as of that date.

---

[3] The YFS filing also sought to terminate the mother's parental rights in Sarah and the parental rights of the mother and the mother's boyfriend in Sarah's half sibling.

The motion to terminate respondent-father's parental rights came on for hearing before the trial court on 12 December 2018.[4] On 2 January 2019, the trial court entered an order terminating respondent-father's parental rights in Sarah on both of the grounds alleged in the termination motion. The trial court further concluded that the termination of respondent-father's parental rights in Sarah would be in the child's best interests. Respondent-father noted an appeal to the Court of Appeals from the trial court's order.[5]

In seeking relief from the trial court's termination order before this Court, respondent-father argues that the trial court erred by determining that his parental rights in Sarah were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) and (2). According to well-established North Carolina law, termination of parental rights proceedings are conducted utilizing a two-stage process. N.C.G.S. §§ 7B-1109, -1110

---

[4] Although the motion that YFS had filed sought to terminate the rights of the parents in both Sarah and her half sibling, the 12 December 2018 hearing was limited to a consideration of the issue of whether respondent-father's parental rights in Sarah should be terminated. The hearing concerning the termination of the mother's rights in Sarah was continued after the mother executed a relinquishment of her parental rights in Sarah on 7 December 2018, *see* N.C.G.S. §§ 48-3-701, 48-3-706 (2017), with this aspect of the termination proceeding being subsequently dismissed after the time within which the mother was entitled to revoke the relinquishment of her parental rights in Sarah had expired. The termination proceeding regarding Sarah's half sibling was dismissed by YFS after a guardian had been appointed for Sarah's half sibling.

[5] Although respondent-father's notice of appeal specifies that his appeal had been noted to the Court of Appeals, rather than to this Court, we elect, in the exercise of our discretion, to issue a writ of certiorari authorizing review of respondent-father's challenges to the trial court's termination order on the merits in the exercise of our discretion given the seriousness of the issues that are implicated by the trial court's termination order. *In re N.D.A.*, 373 N.C. 71, 73–74, 833 S.E.2d 768, 771 (2019).

(2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S. § 7B-1109(f) (2017)). "If [the trial court] determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110). "This Court reviews a trial court's adjudication decision pursuant to N.C.G.S. § 7B-1109 'in order to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law,' with the trial court's conclusions of law being subject to de novo review on appeal." *In re N.D.A.*, 373 N.C. 71, 73, 833 S.E.2d 768, 771 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984) (citation omitted)). Findings of fact that are not challenged on appeal on the grounds that they lack sufficient evidentiary support are binding for purposes of appellate review. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

In his initial challenge to the trial court's termination order, respondent-father argues that the trial court erred by concluding that his parental rights in Sarah were subject to termination on the grounds of neglect.

> According to N.C.G.S. § 7B-1111(a)(1), a trial court has the authority to terminate a parent's parental rights in a child in the event that the parent has neglected the child as that term is defined in N.C.G.S. § 7B-101, which provides that a neglected juvenile is, among other things, a juvenile who "does not [receive] proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned."

*In re N.D.A.*, 373 N.C. at 79–80, 833 S.E.2d at 774–75 (quoting N.C.G.S. § 7B-101(15)).  As the Court of Appeals has recognized, "[n]eglect is more than a parent's failure to provide physical necessities and can include the total failure to provide love, support, affection, and personal contact."  *In re C.L.S.*, 245 N.C. App. 75, 78, 781 S.E.2d 680, 682 (citation omitted), *aff'd per curiam*, 369 N.C. 58, 791 S.E.2d 457 (2016).

> "[I]n deciding whether a child is neglected for purposes of terminating parental rights, the dispositive question is the fitness of the parent to care for the child 'at the time of the termination proceeding.'"  In the event that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, 'requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible.'"  In such circumstances, the trial court may find that a parent's parental rights in a child are subject to termination on the grounds of neglect in the event that the petitioner makes "a showing of past neglect and a likelihood of future neglect by the parent."

*In re N.D.A.*, 373 N.C. at 80, 833 S.E.2d at 775 (citations omitted).  "If past neglect is shown, the trial court also must then consider evidence of changed circumstances."  *In re M.A.W.*, 370 N.C. 149, 152, 804 S.E.2d 513, 516 (2017) (citing *In re Ballard*, 311

N.C. 708, 715, 319 S.E.2d 227, 232 (1984)). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding.*" *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232.

After noting that it had received its orders in the underlying neglect and dependency case into evidence without objection, the trial court made detailed findings of fact based upon those orders and the testimony that had been received at the termination hearing. Among other things, the trial court found in Finding of Fact No. 15 that Sarah had been adjudicated to be a neglected and dependent juvenile on 15 February 2017 and determined in Finding of Fact No. 16 that YFS had proposed an initial case plan for the purpose of addressing the barriers to reunification between respondent-father and Sarah which, in the trial court's opinion, consisted of substance abuse, mental health, and respondent-father's lack of stable housing and employment. In Finding of Fact Nos. 17 through 56, the trial court delineated respondent-father's progress, or lack thereof, in addressing those barriers to reunification between the date upon which Sarah had been adjudicated to be a neglected and dependent juvenile and the date of the final review hearing, which had been held on 12 September 2018. In Finding of Fact Nos. 57 through 73, the trial court addressed the extent to which respondent-father had addressed the barriers to reunification between the date of the 12 September 2018 review hearing and the date of the 12 December 2018 termination hearing. According to the trial court's findings of fact, respondent-father (1) never made significant, sustained progress toward

addressing the barriers to his reunification with Sarah; (2) had not established a relationship with Sarah; and (3) only desired to have contact and visit with Sarah instead of obtaining custody of her.

Based upon these findings of fact, the trial court concluded that respondent-father's parental rights in Sarah were subject to termination for neglect. *See* N.C.G.S. § 7B-1111(a)(1). More specifically, the trial court determined in Conclusion of Law No. 8 that, "[p]ursuant to N.C.G.S. §[ ]7B-1111(a)(1), [respondent-father] has neglected the juvenile as that term is defined in N.C.G.S. §[ ]7B-101(15) in that he has failed to provide proper care, supervision or discipline for the juvenile" and further determined in Conclusion of Law No. 9 "that the likelihood of ongoing or continued neglect in the future is significantly high if the juvenile is returned to [respondent-father's] care." The trial court explained the rationale underlying the second of these two determinations in Conclusion of Law No. 9, stating that:

> [Respondent-father] has made almost no effort to establish a relationship with [Sarah], even in the 14 months since he was released from prison. He has continued to engage in criminal activity since his release from prison, resulting in incarceration and unavailability to [Sarah]. Additionally, even when not incarcerated, [respondent-father] hasn't complied with his case plan services specifically identified to address the barriers to reunification . . . .

In challenging the trial court's determination that his parental rights in Sarah were subject to termination on the grounds of neglect, respondent-father begins by asserting that many of the trial court's findings of fact lacked sufficient evidentiary

support or were otherwise erroneous. More specifically, respondent-father contends that a number of the trial court's findings were inaccurate and misleading given that he was not responsible for the conditions that led to Sarah's placement in YFS custody; that he lacked sufficient time to make adequate progress in complying with his case plan given that he had been incarcerated for fourteen months of the two-year interval between the date upon which Sarah was taken into YFS custody and the date of the termination hearing; and that YFS had failed to make adequate efforts to assist him in addressing the problems that he faced during the relevant time period. In addition, respondent-father has identified various findings of fact that he claims to be erroneous on the grounds that they fail to account for the progress that he had made in addressing the obstacles to his reunification with Sarah prior to the date of the termination hearing. We are not persuaded by any of respondent-father's challenges to the trial court's findings of fact.

As an initial matter, we note that respondent-father's contention that the trial court erred by finding that his parental rights were subject to termination on the grounds of neglect because he was not responsible for the conditions that resulted in Sarah's placement in YFS custody is devoid of merit. Simply put, there is no requirement that the parent whose rights are subject to termination on the grounds of neglect be responsible for the prior adjudication of neglect. As we have previously explained, "[i]n determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or

culpability of the parent." *In re M.A.W.*, 370 N.C. at 154, 804 S.E.2d at 517 (quoting *In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 252). In light of that fact, we held in *In re M.A.W.* that a prior adjudication of neglect based upon a mother's substance abuse and mental health problems was "appropriately considered" by the trial court as "relevant evidence" in determining whether the parental rights of a father who had been incarcerated at the time of the initial adjudication should be terminated. *Id.* at 150–54, 804 S.E.2d at 515–17; *see also In re C.L.S.*, 245 N.C. App. at 78–79, 781 S.E.2d at 682–83 (affirming the termination of a father's parental rights on the grounds of neglect even though the father had been incarcerated and paternity had not been established at the time that the juvenile was adjudicated to be neglected based, in part, upon the mother's substance abuse problems). Moreover, we note that the determination that Sarah was a neglected and dependent juvenile rested, in part, upon findings that respondent-father's "[p]aternity ha[d] not been established" and that "[respondent-father] ha[d] never seen [Sarah] nor ha[d] he provided any financial or emotional support to her."

Respondent-father's contention that he had not been given an adequate opportunity to satisfy the requirements of his case plan prior to the termination of his parental rights in Sarah because he had been in prison for approximately fourteen months of the two-year period during which Sarah had been in YFS custody is equally unpersuasive. This Court and the Court of Appeals have both emphasized that "[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of

parental rights decision[,]" *In re T.N.H.*, 372 N.C. 403, 412, 831 S.E.2d 54, 62 (2019)

(quoting *In re M.A.W.*, 370 N.C. at 153, 804 S.E.2d at 517), and that incarceration

> "does not negate a father's neglect of his child" because
> "[t]he sacrifices which parenthood often requires are not
> forfeited when the parent is in custody." Thus, while
> incarceration may limit a parent's ability "to show
> affection, it is not an excuse for [a parent's] failure to show
> interest in [a child's] welfare by whatever means available
> . . . ."

*In re C.L.S.*, 245 N.C. App. at 78, 781 S.E.2d at 682 (quoting *Whittington v. Hendren*,

156 N.C. App. 364, 368, 576 S.E.2d 372, 376 (2003)). As the record reflects,

respondent-father had been incarcerated for approximately ten months between the

time that YFS obtained nonsecure custody of Sarah on 2 December 2016 and the date

of his release on 21 September 2017, which, in turn, occurred approximately fourteen

months prior to the date of the 12 December 2018 termination hearing. In addition,

respondent-father had been incarcerated for a brief period of time in February 2018

based upon an alleged parole violation and for the period between 14 May 2018 and

6 September 2018 as the result of the fact that he had been charged with committing

new drug-related offenses. The evidentiary record developed in this case shows that

respondent-father made minimal efforts to show interest in Sarah while incarcerated,

sending just a single birthday card to her after the trial court advised him that "he

may send any mail or gifts to [Sarah] through the social worker" and after YFS

encouraged him to do so. Moreover, even though respondent-father had been unable

to engage in the full range of remedial services required by his case plan during the

first of these multiple periods of incarceration,[6] his own conduct led to this aspect of his inability to attempt to satisfy the requirements of his case plan in 2018. As the trial court recognized in Conclusion of Law No. 9, respondent-father's continued criminal activity and the resulting separation from Sarah justifies, rather than undercuts, the trial court's determination that there was a significant likelihood that Sarah would be neglected in the event that she was returned to respondent-father's care. As a result, the trial court did not err in the manner in which it addressed respondent-father's incarceration and the extent of his ability to satisfy the requirements of his case plan in the process of finding that his parental rights in Sarah were subject to termination on the basis of neglect.

Finally, respondent-father faults YFS for not doing enough to assist him in satisfying the requirements of his case plan. More specifically, respondent-father argues that YFS did not maintain contact with him, failed to recommend specific services that would be of assistance to him in addressing the problems that prevented his reunification with Sarah, and made minimal attempts to assess his progress in satisfying the requirements of his case plan after his release from incarceration on 6

---

[6] Although respondent-father asserts that he made progress toward satisfying the requirements of his case plan while incarcerated because, "during his first incarceration, [he] earned his high school equivalency diploma and completed a college course in computer technology[, which] furthered his case plan goal of obtaining gainful employment after incarceration," the trial court specifically found that "[those] courses were completed prior to [Sarah] entering YFS custody[ ] and were not related to his case plan objectives." In view of the fact that respondent-father has not challenged this finding of fact as lacking sufficient evidentiary support, it is binding upon this Court for purposes of appellate review. *See Koufman*, 330 N.C. at 97, 408 S.E.2d at 731.

September 2018. The evidentiary record developed in this case undercuts the validity of this aspect of respondent-father's argument.

In each of the review orders entered while Sarah was in YFS custody, the trial court found, as required by N.C.G.S. § 7B-906.2(c), that YFS had made reasonable efforts to eliminate the conditions that had led to Sarah's removal from the family home. In addition, the record, as reflected in the trial court's findings of fact, establishes that respondent-father, rather than YFS, was responsible for his failure to satisfy the requirements of his case plan. According to the record evidence, a representative of YFS met with respondent-father for the purpose of discussing his case plan on at least four separate occasions while he was in prison and met with him on one other occasion following his release from incarceration in September 2017. During those meetings, the YFS representative emphasized the importance of respondent-father's case plan and the need for respondent-father to complete a FIRST assessment in order to ensure the development of an appropriate case plan. In spite of these admonitions, respondent-father never obtained the required FIRST assessment.

In addition, respondent-father failed to immediately contact YFS upon his release from incarceration in September 2018, despite having been instructed to do so and his commitment to YFS representatives that he would comply with this instruction. Respondent-father missed or canceled numerous meetings with YFS representatives throughout the time that Sarah was in YFS custody and provided

minimal verification of the claim that he made at the termination hearing to have been making progress toward complying with the requirements of his case plan. Although respondent-father argues that the trial court placed an undue emphasis upon the importance of the requirement that he complete a FIRST assessment,[7] the evidentiary record and the trial court's findings establish that the FIRST assessment was an integral component of respondent-father's case plan that was intended to identify the barriers to his reunification with Sarah, including his difficulties with substance abuse, mental health, physical health, and parenting skills, and to allow YFS to recommend suitable services to assist respondent-father in addressing those barriers to reunification with Sarah. As a result, the trial court's determination in Finding of Fact No. 65 that respondent-father's "failure to consistently respond to, or engage with, [YFS] and recommended services limited [YFS's] ability to assist him" is supported by ample record evidence and precludes acceptance of respondent-father's argument that YFS failed to make reasonable efforts to assist him in overcoming the barriers to reunification that he needed to address.

Aside from these more generalized complaints, respondent-father asserts that Finding of Fact Nos. 33–35, 37, 41–44, 46, 48, 53–55, and 58–73 are erroneous or

_____

[7] The arguments made by respondent-father with respect to the FIRST assessment strike us as being inconsistent. At various points, respondent-father claimed that he did not need to complete the FIRST assessment because he did not have a substance abuse problem, that the FIRST assessment was unnecessary because he had enrolled in substance abuse treatment, and that the FIRST assessment was part of the parenting education component of his case plan.

misleading. As a general proposition, respondent-father refrains from asserting that these findings of fact lack sufficient evidentiary support, an argument that would be unavailing given that they are clearly based upon these review orders and the evidentiary record developed at the termination hearing. Instead, respondent-father advances challenges to these findings on a collective rather than an individual basis,[8] arguing, primarily, that the findings fail to account for the progress that he had made in completing the requirements of his case plan during the period immediately preceding the 12 December 2018 termination hearing. In reviewing respondent-father's challenges to the trial court's findings of fact, we will focus upon those findings that are necessary to support the trial court's determination that respondent-father's parental rights in Sarah are subject to termination on the grounds of neglect, *see In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58–59, while remaining mindful that this Court's role is to determine whether the trial court's findings are supported by clear, cogent, and convincing evidence, *see In re N.D.A.*, 373 N.C. at 74, 833 S.E.2d at 771, and that we should avoid any sort of appellate reweighing of the evidence.

---

[8] For example, respondent-father asserts that "nearly all" of Finding of Fact Nos. 58–73 are erroneous because they "recite the same themes: [respondent-father] made no progress on his case plan; he failed to engage in his case plan and work with YFS or the [guardian ad litem]; he failed to communicate with YFS and the [guardian ad litem] for long periods; he never demonstrated any commitment to Sarah or any genuine interest in reuniting with her; he only attended Cornerstone [Treatment Program] because he was court-ordered and never successfully completed it; he refused substance abuse treatment because he never obtained a FIRST assessment."

According to the trial court, it was likely that Sarah would be neglected if she was returned to respondent-father's care because respondent-father had "made almost no effort to establish a relationship with [Sarah], even in the 14 months since he was released from prison." In support of this determination, the trial court found as a fact that:

> 70. Since [Sarah] entered YFS custody, [respondent-father] has not made himself available to the child to provide the care, personal contact, love, and affection that inheres in the parental relationship.
>
> 71. [Respondent-father] has only attended two visits with [Sarah] over the life of this case, despite visitation arrangements being in place and the father being encouraged to set them up with [the maternal great-aunt]. Prior to [Sarah] entering custody, [respondent-father] had not had any contact with [Sarah].
>
> 72. [Respondent-father] has not provided any gifts to [Sarah] over the life of this case. He sent one birthday card to [Sarah] through [YFS] in 2017.
>
> 73. The first step for any parent towards reunification with their child is to acknowledge that they are ready and willing to reunify with the juvenile. Over the life of this case, [respondent-father] has never indicated his willingness, ability, and intention to reunify with [Sarah]. He has clearly and consistently stated that he does not want full custody of [Sarah]. . . . [Respondent-father] has stated that he would like the maternal great[-]aunt to be granted guardianship of [Sarah]. [Respondent-father] has never identified any alternative placement options for [Sarah].

Respondent-father's contentions to the contrary notwithstanding, each of these findings has ample evidentiary support and accurately depicts the relevant record evidence.

As far as Finding of Fact No. 71, which addresses the issue of visitation, is concerned, the record evidence shows that, prior to his initial release from incarceration, respondent-father was authorized to visit with Sarah on the condition that he provide a clean drug screen. According to the order entered following the 20 December 2017 review hearing and the testimony elicited at the termination hearing, respondent-father did not visit with Sarah until shortly after the 20 December 2017 review hearing, even though such visits had been authorized on 21 November 2017 after he provided two negative drug screens. In spite of respondent-father's suggestion that YFS had failed for over a month after his visits with Sarah had been approved to arrange for his first visit with Sarah, the record evidence shows that respondent-father had been advised to contact the maternal great-aunt directly in order to schedule visits and that respondent-father had failed to follow up with the great-aunt for the purpose of making the necessary arrangements after an initial exchange of text messages. In addition, the record contains evidence tending to show that, even though respondent-father's visitation plan was still in place at the time of the 20 February 2018 review hearing, which was held after respondent-father had been arrested for violating the terms and conditions of his parole, his visitation with Sarah had been suspended until respondent-father provided a negative drug screen

and met with representatives of YFS. Moreover, the record reflects that respondent-father's visits with Sarah were not reinstated until his case plan was updated on 29 November 2018. Respondent-father had a second visit with Sarah on 1 December 2018. In confirmation of this evidence, respondent-father testified at the termination hearing that he had had two visits with Sarah since his release from incarceration in September 2017. As a result, we have no difficulty in holding that Finding of Fact No. 71 has ample record support.

The record also provides adequate support for Finding of Fact No. 72. Finding of Fact No. 72 is supported by unchallenged Finding of Fact Nos. 20 and 22, which provide that "[t]he [c]ourt advised [respondent-father at the 11 May 2017 review hearing] that he may send any mail or gifts to [Sarah] through the social worker," that "[his social worker] encouraged [him] to do so[,]" and that respondent-father had "sent [Sarah] a birthday card [prior to the 25 August 2017 review hearing]." In spite of the fact that respondent-father claimed to have sent a money order to the maternal great-aunt in November 2018 and that he was planning to send another money order to the great-aunt and Christmas gifts to Sarah in December 2018, there is no evidence in the record confirming that respondent-father sent the initial money order nor any indication that respondent-father had sent the other money order and gifts prior to the termination hearing. As a result, we are unable to accept respondent-father's challenge to the sufficiency of the record support for Finding of Fact No. 72.

Finding of Fact No. 73 has ample evidentiary support, as well. In spite of respondent-father's expressed desire to have contact with, and visit with Sarah, the findings of fact contained in the review orders and the testimony delivered by the social workers at the termination hearing demonstrate that respondent-father initially expressed uncertainty concerning the extent to which he wished to attempt to comply with a case plan, that he was worried about being accused of misconduct in the event that he cared for Sarah by himself, and that he was uncertain about his ability to care for Sarah without "an old lady" to help. Subsequently, respondent-father stated that he wanted the maternal great-aunt to have legal guardianship of Sarah. Finally, the social worker with responsibility for this matter at the time of the termination hearing testified that, since she had been assigned to work with Sarah on 24 September 2018, respondent-father had never asked that Sarah be placed in his care and had, instead, indicated that "he does not want custody of [Sarah]" and "just wants to remain in her life and have visits with her." As a result, for all of these reasons, we hold that Finding of Fact Nos. 71 through 73 are supported by clear, cogent, and convincing evidence and buttress the trial court's ultimate finding that respondent-father "ha[d] not made himself available to the child to provide the care, personal contact, love, and affection that inheres in the parental relationship."

In addition, the trial court determined that there was a likelihood of future neglect in the event that Sarah was returned to respondent-father's care because

respondent-father "ha[d] continued to engage in criminal activity since his release from prison, resulting in incarceration and unavailability to [Sarah]." The trial court found in Finding of Fact No. 43 that respondent-father had been incarcerated from 7 February 2018 to 12 February 2018 for a parole violation and found in Finding of Fact Nos. 50, 53, and 54 that respondent-father had been arrested and held in pretrial detention based upon new drug-related charges, for which he was ultimately convicted, from 14 May 2018 to 6 September 2018. Although respondent-father challenged the validity of these findings of fact, the only argument that he has advanced in support of this contention rests upon the assertion that the trial court had erroneously described the sentence that had been imposed upon him in connection with these convictions for the three new drug-related charges.

According to Finding of Fact Nos. 53 and 54, respondent-father entered pleas of guilty to and was convicted of possession of heroin, possession of methamphetamine, and possession of drug paraphernalia on 5 September 2018; was sentenced to a suspended term of six to seventeen months imprisonment and placed on supervised probation for a period of thirty months on the condition that he complete the Cornerstone Treatment Program; was released from jail on 6 September 2018 into the custody of the Cornerstone Treatment Program in accordance with the terms and conditions of his probation; and failed to contact YFS prior to the 12 September 2018 review hearing. Although the judgment that was entered based upon respondent-father's drug-related convictions was not admitted into evidence,

respondent-father testified that he had pleaded guilty to the drug-related charges identified in Finding of Fact No. 53 on 5 September 2018 and had received a six to seventeen month suspended sentence. In spite of the fact that respondent-father claimed that he had "chose[n] to go" to the Cornerstone Treatment Program and expressed uncertainty about whether he had been ordered to enroll in and complete that program, he also testified that he "was court-ordered to stay [at the Cornerstone Treatment Program]" and had been "ordered only to be released to the Cornerstone Treatment Program." Thus, we hold that the record contains sufficient evidence to support the trial court's essential findings concerning the nature of defendant's drug-related convictions and the sentence that was imposed upon him in light of those convictions.

Finally, the trial court determined that there was a likelihood of future neglect in the event that Sarah was returned to respondent-father's care on the grounds that, "even when not incarcerated, [respondent-father] hasn't complied with his case plan services specifically identified to address the barriers to reunification." The trial court's conclusion to this effect is supported by Finding of Fact Nos. 66 and 69, which state that, "[a]t the time of the [termination h]earing, [Sarah] ha[d] remained in YFS custody for a period of two years"; that respondent-father "ha[d] not made significant progress on any portion of his case plan"; and that respondent-father "ha[d] not demonstrated that he ha[d] the ability or willingness to establish a safe home for [Sarah]."

As further support for the determinations contained in Finding of Fact Nos. 66 and 69, the trial court found as a fact that:

> 63. There is no evidence before the [c]ourt that [respondent-father] has maintained long-term sobriety.
>
> . . . .
>
> 67. [Respondent-father] has not maintained stable housing or employment. Since his discharge from the Cornerstone [Treatment Program] halfway house, it is unknown where he is currently residing. He has never provided verification of employment or income over the life of the case. He has not completed a parenting education program. He has not maintained consistent contact with [Sarah] through visits. He has significant medical and mental health issues but did not cooperate with YFS and the FIRST Program to assess and treat those conditions, and he has not provided any evidence to the [c]ourt of how he is appropriately managing those conditions.
>
> 68. The only case plan progress [that respondent-father] has made has occurred within the past 30–60 days, and occurred pursuant to his recent court-ordered supervised probation. Until entering the Cornerstone [Treatment P]rogram in September 2018, [respondent-father] remained adamant that he did not need or intend to engage with the FIRST Program which would have assessed his need for substance abuse treatment services, along with mental health and parenting education services.

In response, respondent-father asserts that these findings are in error to the extent that they indicate he had made no progress toward satisfying the requirements of his case plan and fail to account for the record evidence tending to show that he had recently made progress toward satisfying the requirements of his case plan in advance of the termination hearing.

Admittedly, the trial court did state in Finding of Fact No. 44 that, as of the 20 February 2018 review hearing, respondent-father "had made no progress towards reunification." To the extent that Finding of Fact No. 44 fails to reflect the undisputed evidence concerning respondent-father's visit with Sarah shortly after the 20 December 2017 review hearing or the irregular contact that respondent-father had with YFS representatives following his release from prison, it does overstate the degree of respondent-father's noncompliance with the provisions of his case plan. For that reason, we will refrain from taking that portion of the trial court's termination order into consideration in determining whether it should be affirmed or reversed on appeal. *See In re T.N.H.*, 372 N.C. at 411, 831 S.E.2d at 61 (noting that, even if a finding lacks sufficient evidentiary support, the remaining findings more than sufficed to support the challenged termination order).

A careful review of the remaining findings reveals that they either detail respondent-father's progress in addressing specific components of his case plan during the relevant review periods or indicate that respondent-father had not made "adequate progress" toward completing the requirements of his case plan or "significant progress" toward reunification. The review orders entered throughout the pendency of the underlying neglect and dependency proceeding and the social workers' testimony concerning respondent-father's actions during the relevant review periods amply support the trial court's determination that respondent-father had not made adequate progress toward satisfying the requirements of his case plan or

significant progress toward reunification prior to the 12 September 2018 review hearing.

In addition, the trial court made Finding of Fact Nos. 58 through 62 for the purpose of addressing the extent to which respondent-father had made progress toward satisfying the requirements of his case plan after the 12 September 2018 review hearing. In Finding of Fact Nos. 58 through 61, the trial court found that respondent-father's case plan had been updated over the telephone on 29 November 2018 after the cancellation of a scheduled 8 November 2018 meeting between YFS representatives and respondent-father; respondent-father's visitation with Sarah had been reinstated after respondent-father provided proof of negative drug screens from September and October 2018 to YFS; respondent-father had visited with Sarah on 1 December 2018; and respondent-father had completed a thirty-hour substance abuse program through the Restorative Justice Center in October 2018. In Finding of Fact Nos. 61 and 62, the trial court found that, while respondent-father had participated in the Cornerstone Treatment Program, he had failed to present evidence concerning the extent of his treatment needs, the nature of his treatment goals, and the content of the services that Cornerstone had recommended for him. In addition, the trial court found that respondent-father had not been engaged in any substance abuse treatment following his discharge from the Cornerstone Treatment Program on 9 December 2018 after he failed to return to the facility by the designated

time. A careful examination of the record reveals that each of these findings are supported by the social worker's testimony during the termination hearing.

Respondent-father's challenge to the adequacy of the trial court's findings concerning his progress between the 12 September 2018 review hearing and the 12 December 2018 termination hearing rests primarily upon respondent-father's contentions concerning findings that the trial court did not make. According to respondent-father, the trial court's findings fail to take into account his testimony about his recent employment, his treatment for medical problems, his completion of the Cornerstone Treatment Program, the extent of his substance abuse treatment, his negative drug screens in November and December 2018, the money order that he had sent to the maternal great-aunt, the money order that he planned to send to the great-aunt and the gifts that he planned to send to Sarah in December 2018, and his application for housing at Oxford House. The record clearly reflects, however, that the trial court adequately considered respondent-father's testimony. In fact, during the termination hearing, the trial court requested that respondent-father's trial counsel refrain from asking repetitive questions on the grounds that they had been "asked and answered" and that it had heard respondent-father's earlier testimony. In addition, the record clearly reflects that the trial court simply failed to credit the portions of respondent-father's testimony upon which this argument relies, given the absence of any verification for respondent-father's assertions. Aside from the fact that the social workers who testified at the termination hearing repeatedly stated

that respondent-father had not provided proof in support of his claims to have recently made progress toward eliminating the barriers to his reunification with Sarah, respondent-father acknowledged that he had failed to provide supporting documentation for these claims and defended his failure to provide such documentation on the grounds that he did not know that he needed to provide such evidence and was not "about to provide something that [he] wasn't asked for."  As further evidence of the trial court's unwillingness to find respondent-father's unsupported testimony credible in the absence of supporting documentation, Finding of Fact No. 62 states that, despite his testimony that he had tested negative for the presence of drugs in November and December 2018, respondent-father had "failed to provide any evidence of [the] negative drug screens."[9]  Similarly, in Finding of Fact No. 67, the trial court noted that "[respondent-father had] never provided verification of employment or income over the life of the case."   Thus, the record clearly establishes that the trial court simply did not find respondent-father's testimony concerning his recent efforts to comply with the requirements of his case plan to be credible, which is a determination that it is entitled to make without fear of appellate reversal in light of the applicable standard of review.  *See In re T.N.H.*, 372 N.C. at

---

[9] Although defendant claims to have attempted to introduce evidence concerning the allegedly negative November and December drug screens and asserts that his efforts to do so were unsuccessful because the trial court sustained an objection to the admission of the evidence in question, the portion of the transcript to which respondent-father directs our attention in support of this contention shows, instead, that the trial court sustained a YFS objection to the admission of evidence concerning the drug screens for September and October 2018, which the trial court found to have been negative in Finding of Fact No. 58.

411, 831 S.E.2d at 61; *see also In re D.L.W.*, 368 N.C. at 844, 788 S.E.2d at 168. As a result, we conclude that there is ample evidentiary support for the trial court's findings that respondent-father had failed to make adequate progress toward achieving long-term sobriety, stable housing, and employment; had not maintained consistent contact with Sarah; had not completed a FIRST assessment or a parenting education program; and had only made progress toward satisfying some of the requirements of his case plan in order to avoid violating the terms and conditions of his probation and that the trial court did not err by stating in Finding of Fact Nos. 66 and 69 that respondent-father "ha[d] not made significant progress on any portion of his case plan" and "ha[d] not demonstrated that he ha[d] the ability or willingness to establish a safe home for [Sarah]."

Having determined that the trial court's findings of fact have adequate evidentiary support, we next consider whether the trial court's findings support its determination that respondent-father's parental rights in Sarah were subject to termination on the grounds of neglect. *See* N.C.G.S. § 7B-1111(a)(1); *see also In re N.D.A.*, 373 N.C. at 79–80, 833 S.E.2d at 775. We addressed a similar set of circumstances in *In re M.A.W.*, in which a child had been adjudicated to be a neglected juvenile based upon the mother's substance abuse and mental health problems while the father was incarcerated and in which "the trial court made an independent determination that neglect sufficient to justify termination of [the father's] parental rights existed at the time of the termination hearing and that a likelihood of

repetition of neglect also existed." 370 N.C. at 153–54, 804 S.E.2d at 517 (citation omitted). In reversing a decision of the Court of Appeals overturning the trial court's termination order, *see In re M.A.W.*, 248 N.C. App. 52, 787 S.E.2d 461 (2016), *rev'd*, 370 N.C. 149, 804 S.E.2d 513 (2017), this Court held that the "trial court . . . appropriately considered the prior adjudication of neglect as relevant evidence during the termination hearing" and that the trial court's findings supported its determination that there was a likelihood that the neglect to which the juvenile had been subjected would be repeated if the child was to be placed in his care, given that the father "had a long history of criminal activity and substance abuse" and that, even though the father had "initially indicated his desire to be involved in [the juvenile's] life," he had, "after his release, failed to follow through consistently with the court's directives and recommendations." *In re M.A.W.*, 370 N.C. at 153, 154, 804 S.E.2d at 517. We reached this result on the grounds that, "[a]lthough [the father] completed a parenting course, attended Alcoholics Anonymous meetings, and completed his General Educational Development (GED) program while incarcerated, the trial court made numerous relevant findings of fact supporting termination that illuminated respondent's behavior following his release and which established a likelihood of repetition of neglect," *id.* at 154, 804 S.E.2d at 517, including findings that the father had not complied with the recommendations made during his substance abuse assessment; that the regularity of the father's visits with the juvenile had diminished over time; that the father had not provided proof that he had

completed the parenting course that he had taken while incarcerated; that the father denied social workers access to the residence of his mother, in which he allegedly lived; that the father's testimony that he was self-employed lacked credibility; that the father did not comply with clinical assessments; and that the father had not provided any care, discipline, or supervision to the juvenile since his release from incarceration approximately nine months earlier. *Id*. at 155, 804 S.E.2d at 518.

The trial court's findings of fact in this case are similar to those deemed sufficient to support the trial court's termination decision in *In re M.A.W.* In addition to finding that Sarah had been adjudicated to be a neglected and dependent juvenile on 15 February 2017, the trial court found that respondent-father had a history of criminal activity and substance abuse; that respondent-father had continued to engage in criminal activity during the pendency of the underlying neglect and dependency proceeding that resulted in his reincarceration and created additional limitations upon his ability to be available to Sarah; that respondent-father had not established a relationship with Sarah prior to the time that she was removed from the mother's care and had only visited with Sarah twice following his initial release from incarceration; that respondent-father had not developed a relationship with or demonstrated the ability to care for Sarah since his release from incarceration; and that respondent-father had not made significant progress toward correcting the barriers to reunification that were identified by the trial court, including addressing issues relating to employment, housing, substance abuse, mental health, and

parenting skills. Thus, as was the case in *In re M.A.W.*, we hold that "[t]he trial court properly found that past neglect was established by [YFS] and that there was a likelihood of repetition of neglect[,]" 370 N.C. at 156, 804 S.E.2d at 518, given that the trial court's findings provide ample justification for its conclusion that respondent-father was unable to properly care for Sarah at the time of the termination hearing, s*ee In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232 (explaining that the trial court must consider evidence of changed circumstances in addition to evidence of the prior adjudication of neglect, with the determinative factors being the best interests of the child and the parent's fitness to care for the child at the time of the termination hearing).

In light of this determination, we hold that the trial court did not err by concluding that respondent-father's parental rights in Sarah were subject to termination on the grounds of neglect pursuant to N.C.G.S. § 7B-1111(a)(1). Moreover, given that "a finding by the trial court that any one of the grounds for termination enumerated in N.C.G.S. § 7B-1111(a) exists is sufficient to support a termination order[,]" *In re B.O.A.*, 372 N.C. 372, 380, 831 S.E.2d 305, 311 (2019) (citations omitted), we need not address respondent-father's challenge to the trial court's determination that his parental rights in Sarah were subject to termination based upon his willful failure to make reasonable progress toward correcting the conditions that led to Sarah's removal from the family home pursuant to N.C.G.S. § 7B-1111(a)(2). As a result, in light of the fact that respondent-father has not

advanced any challenge to the trial court's dispositional decision in his brief before

this Court, the trial court's termination order is affirmed.

AFFIRMED.