IN THE SUPREME COURT OF NORTH CAROLINA

No. 122A20

Filed 11 December 2020

IN THE MATTER OF: R.L.D.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 9 December 2019 by Judge S. Katherine Burnette in District Court, Franklin County. This matter was calendared for argument in the Supreme Court on 23 November 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*No brief for petitioner-appellees.*

*Edward Eldred for respondent-appellant mother.*

HUDSON, Justice.

Respondent-mother appeals from the trial court's orders terminating her parental rights to R.L.D. ("Robin").[1] After careful review, we affirm.

Robin was born to respondent-mother in Illinois in 2006. After Robin was born, respondent-mother and Robin's father resided together in a motel in Kankakee, Illinois. During this time, in November 2007, Robin's leg was broken, and respondent-mother and the father were investigated by Child Protective Services. Robin's

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

paternal aunt, G.D., testified that she visited the motel and observed that Robin did not have a crib to sleep in, that there was never any food in the room, that the room did not have a stove, and that respondent-mother and the father "were constantly doing drugs and [the father] was drinking a lot." In 2008, respondent-mother and the father were evicted from the motel and they, along with Robin, moved into the home of the paternal uncle, R.D., and G.D.

Respondent-mother and Robin lived with R.D. and G.D. only for a short period of time before leaving. The father remained with R.D. and G.D. In 2009, respondent-mother requested that R.D. and G.D. pick up Robin because respondent-mother was living with another man and Robin "was not safe around [respondent-mother's] boyfriend due to domestic violence and the boyfriend's insistence that [Robin] sleep in the same bed as the adults."

Robin lived with R.D. and G.D., along with the father, until December 2011. In December 2011, the father and Robin moved out of R.D. and G.D.'s home and moved in with the father's girlfriend. However, in August 2012, Robin was exposed to domestic violence between the father and his girlfriend. The girlfriend called respondent-mother, and respondent-mother subsequently called G.D. to pick up Robin. In 2012, respondent-mother signed a notarized statement in which she granted custody of Robin to R.D. and G.D. Respondent-mother also signed a separate document authorizing R.D. and G.D. to approve any medical treatment deemed necessary for Robin.

In 2014, with respondent-mother's permission, R.D. and G.D. relocated with Robin to North Carolina, where they moved in with their daughter and son-in-law, the petitioners, who are also Robin's cousins by marriage. In January 2015, R.D. and G.D. moved out of petitioners' home and into their own residence. However, due to their own health issues, they decided along with petitioners that Robin would remain in petitioners' home. Robin has remained in petitioners' care since that time. In June 2015, respondent-mother signed an agreement granting petitioners "guardianship" of Robin.

On 15 March 2019, petitioners filed a petition to terminate respondent-mother's and the father's parental rights to Robin. Petitioners alleged that grounds existed to terminate respondent-mother's and the father's parental rights on the grounds of neglect, dependency, and willful abandonment. N.C.G.S. § 7B-1111(a)(1), (6), (7) (2019). On 11 June 2019, respondent-mother filed a response to the petition in which she opposed termination of her parental rights. On 9 December 2019, the trial court entered an order in which it determined grounds existed to terminate respondent-mother's parental rights pursuant to the grounds alleged in the petition. On the same day, the trial court entered a separate disposition order in which it concluded it was in Robin's best interests that respondent-mother's parental rights

be terminated. Accordingly, the trial court terminated respondent-mother's parental rights.[2] Respondent-mother appeals.

Respondent-mother argues that the trial court erred by adjudicating that grounds existed to terminate her parental rights. "Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)). We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111 (1984). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

In this case, the trial court determined that grounds existed to terminate respondent-mother's parental rights based on neglect, dependency, and willful abandonment. N.C.G.S. § 7B-1111(a)(1), (6), (7). We begin our analysis with

---

[2] The district court's orders also terminated the parental rights of Robin's father, but he did not appeal and is not a party to the proceedings before this Court.

consideration of whether grounds existed to terminate respondent-mother's parental

rights pursuant to N.C.G.S. § 7B-1111(a)(1).

A trial court may terminate parental rights if it concludes the parent has

neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-

1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile

> whose parent, guardian, custodian, or caretaker does not
> provide proper care, supervision, or discipline; or who has
> been abandoned; or who is not provided necessary medical
> care; or who is not provided necessary remedial care; or
> who lives in an environment injurious to the juvenile's
> welfare; or the custody of whom has been unlawfully
> transferred under [N.C.]G.S. 14-321.2; or who has been
> placed for care or adoption in violation of law.

N.C.G.S. § 7B-101(15) (2019).

> Termination of parental rights based upon this statutory
> ground requires a showing of neglect at the time of the
> termination hearing or, if the child has been separated
> from the parent for a long period of time, there must be a
> showing of . . . a likelihood of future neglect by the parent.

*In re D.L.W.*, 368 N.C. 835, 843 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15

(1984)).[3] "When determining whether such future neglect is likely, the district court

must consider evidence of changed circumstances occurring between the period of

---

[3] The Court in *In re Ballard* held that an adjudication of past neglect is admissible in subsequent proceedings to terminate parental rights, but is not, standing alone, enough to prove that a ground exists to terminate parental rights on the basis of neglect. 311 N.C. at 713–15. The Court in *In re Ballard* did not suggest that a showing of past neglect is necessary in order to terminate parental rights in every case. Indeed, N.C.G.S. § 7B-1111(a)(1) does not require a showing of past neglect if the petitioner can show current neglect as defined in N.C.G.S. § 7B-101(15). To the extent other cases have relied upon *In re D.L.W.* as creating such a requirement, we disavow such an interpretation.

past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212 (2019) (citing *In re Ballard*, 311 N.C. at 715).

Here, Robin was not in respondent-mother's physical custody at the time of the termination hearing and had not been since 2012. Additionally, because the Department of Social Services was not involved in this case, no petition alleging neglect was ever filed, and Robin had not been adjudicated neglected. Therefore, we examine whether the trial court's findings support the conclusion that Robin is likely to be neglected again if returned to respondent-mother's care.

Respondent-mother argues that the trial court's orders fail to establish that Robin is neglected. We disagree. The trial court made the following findings:

> 6. While pregnant with [Robin], G.D. saw [respondent-mother] smoking marijuana. G.D. saw the [respondent-mother] smoking marijuana every weekend.
>
> . . . .
>
> 8. In November, 2007, [Robin's] leg was broken and [respondent-mother was] investigated by Child Protective Services in Kanakee, Illinois. G.D. saw [Robin] with a cast on her leg and was concerned that there was a lack of food and the room in which they stayed was dirty. . . . .
>
> . . . .
>
> 10. In April, 2009, [respondent-mother] asked G.D. and R.D. to pick up [Robin] because [Robin] was not safe around [respondent-mother's] boyfriend due to domestic violence and the boyfriend's insistence that [Robin] sleep in the same bed as the adults.
>
> . . . .

23. [Respondent-mother] has not seen [Robin] since June, 2015.

24. [Respondent-mother] traveled to North Carolina in June, 2015, at the invitation and at the expense of the petitioners so that she could see where the petitioners and the juvenile lived in North Carolina.

25. At the time of her week's visit with petitioners, [respondent-mother] entered into an agreement with the petitioners that they would take "guardianship" of [Robin].

26. In the agreement, dated [29 June 2015], [respondent-mother] agreed that the petitioners could have guardianship of [Robin], and said agreement was to ". . . remain effective indefinitely unless otherwise notified in writing by the undersigned . . ."

27. Some of the decisions that [respondent-mother] specified that the petitioners could make for [Robin] related to her medical treatment, school, education, "decisions regarding all well-being including clothing, bodily nourishment, and shelter."

28. Another agreement provision is that the petitioners are to "accept all financial obligations associated with caring for [Robin]."

29. The petitioners have abided by the terms of the agreement and provided care for [Robin].

30. [Respondent-mother has not] provided financial support for [Robin] since 2012.

31. The petitioners have provided financial support for [Robin], including therapy sessions needed by [Robin].

32. [Robin] is being treated for anxiety and depression, ADHD and PTSD.

33. [Robin] has not lived independently with [respondent-mother] since 2012

34. At no time since August, 2012, has [respondent-mother] had physical custody of the child.

. . . .

38. [Respondent-mother] has intermittently texted [petitioner] F.J. and asked to talk to [Robin] which has been facilitated.

39. [Respondent-mother's] conversations are monitored by petitioner F.J. to make sure that the conversations are appropriate. In the past, [respondent-mother] has called [Robin] "fat" and blamed [Robin] for not calling [respondent-mother]. [Respondent-mother] also cursed and screamed at [Robin] when [respondent-mother] received the notice of the petitioners' intended adoption of [Robin].

40. [Respondent-mother] currently is living in a hotel room in Illinois and has a job at the hotel cleaning rooms. She needs more rooms to clean in order to make more money.

41. Most recently, [petitioner] F.J. heard that [respondent-mother] was renting a room from a man.

. . . .

44. [Respondent-mother] has taken no steps to provide for [Robin's] physical and economic needs.

. . . .

46. [Respondent-mother] took no steps to correct the conditions that led to the removal of [Robin] from her care.

47. [Respondent-mother did not take] any steps to remedy the conditions that led to [Robin] being placed first with G.D. and later with the petitioners.

48. [Respondent-mother's] contact with [Robin] has been sporadic. It has consisted of her texting [petitioner] F.J. to put [Robin] on the phone.

49. [Respondent-mother] has sent a total of three packages to [Robin] since she has been in the care of petitioners. The first one had candy and clothes that did not fit [Robin]. The second one had a $20 gift card. The final one was for Christmas 2018, and arrived in January, 2019.

50. The contents of the last package that [respondent-mother] sent to [Robin] were age inappropriate and inappropriate in all regards as it primarily contained expired food and expired medications.

51. [Robin] is learning to cope with the trauma that she has experienced.

. . . .

65. Respondent-mother has not] put in place the support system that [she] need[s] in order to create an environment where [Robin] will not be neglected in the future.

66. [Robin] is at a substantial risk of harm and of impairment if she is removed from the petitioners' home and is returned to [respondent-mother's] care.

Respondent-mother does not challenge these findings, and they are binding on appeal. *See In re T.N.H.*, 372 N.C. 403, 407 (2019) ("Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal."). It is clear from these findings that when Robin was in respondent-mother's care nearly a decade ago, Robin was "in an environment injurious to [her] welfare," and that those risks continue. N.C.G.S. § 7B-101(15).

In addition to the findings shown above, the trial court also found the following:

> 42. [Respondent-mother] does not have stable housing at this time.

> 43. [Respondent-mother] does not have a stable job in that her most recent job at the wage of $2.00 [per hour] provides her with bare subsistence.

Respondent-mother argues that these findings are not supported by clear, cogent, and convincing evidence. However, petitioner F.J. testified that respondent-mother texted her that "she was living in the motel again, and she makes . . . $2.00 per room. And that . . . she doesn't get a lot of rooms so she doesn't work a lot." Petitioner F.J. additionally testified that "at one point" respondent-mother had moved in with "some other guy" and was "renting a room from him." Thus, we conclude there was clear, cogent, and convincing evidence that respondent-mother had neither stable housing nor employment.

Consequently, we conclude the trial court's findings support its conclusion that there was a substantial risk of harm or impairment to Robin and a likelihood of future neglect should she be removed from petitioners' care and returned to respondent-mother. Therefore, we affirm the trial court's conclusion that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(1) to terminate respondent-mother's parental rights.

The trial court's conclusion that one statutory ground for termination existed pursuant to N.C.G.S. § 7B-1111(a)(1) is sufficient in and of itself to support termination of respondent-mother's parental rights. *In re E.H.P.*, 372 N.C. 388, 395 (2019). As such, we need not address respondent-mother's arguments regarding

N.C.G.S. § 7B-1111(a)(6) and (7). Furthermore, respondent-mother does not challenge the trial court's conclusion that termination of her parental rights was in Robin's best interest. *See* N.C.G.S. § 7B-1110(a) (2019). Accordingly, we affirm the trial court's order terminating respondent-mother's parental rights.

AFFIRMED.