IN THE SUPREME COURT OF NORTH CAROLINA

No. 252PA15

Filed 10 June 2016

IN THE MATTER OF:  D.L.W., D.L.N.W., and V.A.W.


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 773 S.E.2d 504 (2015), affirming in part and reversing in part an order entered on 29 September 2014 by Judge Kathryn Overby in District Court, Alamance County.  Heard in the Supreme Court on 21 March 2016.

*Jamie L. Hamlett for Alamance County Department of Social Services, and Derrick J. Hensley, Guardian ad Litem Program Attorney, for the minor children, petitioner-appellants.*

*Jeffrey William Gillette for respondent-appellee mother.*

*Kathleen Arundell Jackson and Rachael Hawes for North Carolina Association of Department of Social Services Attorneys, amicus curiae.*

JACKSON, Justice.


In this case we consider whether the trial court erred by terminating respondent's parental rights on the basis of neglect and failure to correct conditions that led to the removal of her children.  We hold that the findings in the trial court's order were sufficient to support termination of parental rights based upon both of these grounds.  Therefore, we reverse the decision of the Court of Appeals to the contrary.

On 1 March 2013, the Alamance County Department of Social Services (DSS) filed a petition alleging that minor children D.L.W., D.L.N.W., and V.A.W. were neglected and dependent juveniles. The petition alleged that DSS had received information that the three juveniles were residing with their mother, Marisha Wade (respondent), and their father "in a van located in the woods that is heated by a kerosene heater," that the parents refused to disclose the van's location or cooperate with DSS's investigation into safety and risk issues, and that the juveniles did not bathe, brush their teeth, or receive adequate nutrition. The petition also alleged "significant domestic violence between the parents that places the juveniles at risk." Around this same time, the juveniles were placed in the custody of DSS.

At the 1 May 2013 adjudication hearing, based upon stipulations entered into by the parties, the trial court made the following findings relevant to its determination that the juveniles were neglected:

> [9.]e. At the time of the filing of the petition the Respondent Mother and Father were residing at times with their three children in a van located in the woods.
> f. The Respondent Mother denies the van is heated with a kerosene heater but states the van is run during the night to keep warm, but also states the van is cool enough to store milk.
> g. The Respondent Parents refused to disclose the location of the van so that the Alamance County Department of Social Services can assess safety and risk issues.
> h. It is reported there was domestic violence between the parents that places the juveniles at risk. For example, [V.A.W.] has intervened when the parents are arguing.

. . . .

    j. At times, the family has difficulty providing for basic necessities such as housing, baths and so forth. Their skin is very pale and dry, needing lotion.

. . . .

    l. The Respondent Father is not employed.

    m. The Respondent Mother is employed at AW-NC as a factory worker. She works from 6:00 a.m. until [between] 2:30 p.m. [and] 6:00 p.m. She has been employed for approximately ten months.

    n. The Respondent Mother reports she made the van payment for the first time in several months a few weeks ago. She reports the van is not drivable because the finance company turned the car off. [sic]

    o. The Respondent Mother reports she did not have enough money to maintain a household since becoming a permanent employee on February 18, 2013.

Based upon these and other findings, the trial court concluded as a matter of law that the juveniles were "neglected" as defined by N.C.G.S. § 7B-101(15) and that removal of the children from parental custody was in the children's best interests. The parents were ordered to cooperate with their out-of-home family service case plans, attend and participate in mental health assessments, submit to and comply with random drug screenings, pay child support, obtain or maintain employment, participate in visitation, maintain weekly contact with a social worker, and enroll in domestic violence counseling. In addition, the trial court approved placement of the children with their maternal grandmother.

Following subsequent review and permanency planning hearings, the trial court filed an order on 18 November 2013 reporting the parents' general lack of progress in meeting the goals outlined in their case plans, including that they were living in motels, maintaining only sporadic contact with social workers, and not participating consistently in visitation with the children. The order also reported that although respondent had maintained a full-time job, she could not account for how her money was being spent and had not "provide[d] the agency with a budgeting plan that can account for where the funds coming into the household go," as the trial court had ordered. The trial court endorsed reunification as the primary plan, ordered continued placement with the maternal grandmother, and again ordered that the parents address the problems that were preventing reunification.

After further proceedings on 18 December 2013, the trial court changed its recommendation for the primary plan for the juveniles to adoption, noting the parents' continued failure to comply with their case plans. Specifically, the trial court found that respondent had failed to create a budgeting plan, obtain appropriate housing, or follow the recommendation for treatment of her "social phobia," as diagnosed in her mental health assessment. In addition, the trial court found the status of respondent's required participation in domestic violence courses to be "[u]nknown," stating that although respondent-mother "has indicated in the past that she is taking part," she had "not provided documentation or the location" where the courses were taking place. The trial court concluded as a matter of law that "the

parents have acted inconsistently with their constitutionally protected rights" by previously allowing "the children to reside in an injurious environment" and thereafter failing to take prescribed measures to allow the juveniles to safely "return to or be in their care." The order contained a further conclusion that termination of parental rights was in the children's best interest.

DSS filed a motion for termination of parental rights on 11 March 2014, and the hearing took place over the course of four days in August and September 2014. On 29 September 2014 the trial court filed an order terminating both parents' parental rights based upon neglect pursuant to N.C.G.S. § 7B-1111(a)(1), and based upon a finding that they willfully left the juveniles in foster care for more than twelve months without making sufficient progress in correcting the conditions that led to removal, in accordance with N.C.G.S. § 7B-1111(a)(2).[1] The findings in the order summarized the procedural history of the case and some information contained in previous orders, including the findings in the May 2013 adjudication order based upon the stipulations of the parties. The trial court also made a number of findings regarding its ongoing concerns:

> 38. Since the removal of the juveniles, the parents have resided at three different addresses in Alamance County, North Carolina. They were evicted from all three residence[s] for nonpayment of rent.

---

[1] In addition to terminating the father's parental rights pursuant to subdivisions 7B-1111(a)(1) and (a)(2), the court found an additional statutory ground for terminating his parental rights.

39. The evictions took place for nonpayment of rent despite the fact that, at times during residing at the residences, the parents were employed making between $11.00 and $13.00 an hour for 40-60 hours a week. The employment of the parents was not consistent.

. . . .

45. The Respondent Mother entered into and was court ordered to comply with [an] out-of-home family services agreement. She was to obtain a mental health assessment. She did an initial assessment which indicated diagnoses of social phobia and cannabis dependency full remission. She did not seek out services to address social phobia.

46. The Respondent Mother obtained a second mental health assessment and did answer questions but was not completely truthful reporting stressors in her life. At no point did she get treatment for social phobia. Initially, she was asked to sign releases and did not, but later did.

. . . .

48. The Respondent Mother was to obtain and maintain appropriate housing. She did obtain three different homes, and, at times, resided with friends in Durham. She was not stable, would pay rent for one month but not subsequently without good reason and she does not currently have appropriate housing as she is residing at Allied Churches emergency shelter.

49. The Respondent Mother was to obtain and maintain employment. She was employed at AW working 65 hours a week earning between $11.00 and $13.00 an hour. The money was direct deposited in [her] account. She could not figure out why she could not pay bills or where the money went. In March of 2014, she lost her employment due to incarceration. Initially she lied about the loss of employment, saying she resigned, then that she

lost employment due to snow days and then due to incarceration.

50. The Respondent Mother was to develop a reliable means of transportation. She does not have a valid North Carolina driver's license. She continued to drive without a valid driver's license. In December of 2013, she was charged with careless and reckless and fleeing to elude still [sic]. She drove a vehicle registered in the Respondent Father's name with his knowledge that she did not have a license.

. . . .

52. The Respondent Mother was to attend counseling for victims of domestic violence and be able to articulate what she has learned. She attended seven sessions of the support group at Family Abuse Services in 2013. She attended several meetings since losing her job in March of 2014 but has not consistently attended and has not articulated an[ ] understanding of what she has learned. She continued in a relationship with the Respondent Father and there were significant issues regarding ongoing domestic violence.

. . . .

62. The Respondent Parents were required to do a budgeting plan but failed to do so despite being employed for periods of more than one month. Their failure to appropriately budget their funds has continued to result in instability.

. . . .

65. On two differen[t] occasions in 2014, law enforcement has been called to the home of the parents due to domestic violence between the parents.

66. At one point the mirror on the car was broken off and on another occasion[ ] the Respondent Father was scratched and bleeding. During the same incident the

Respondent-Mother's belongings were destroyed and damaged.

67. The Respondent Mother indicated that she paid, at some point, $60.00 a month for storage of items and would take half days from work [to] get business done, obtain copies of court documents and get her hair done. However, she could not attend visitation due to her work schedule.

. . . .

73. There is a likelihood of repetition of neglect of the minor child[ren] in that neither the mother nor the father have made reasonable progress given their individual circumstance[s] in the twelve months preceding the filing of the motion for termination of parental rights.

Both respondent and the father appealed.

In a unanimous opinion filed on 19 May 2015, the North Carolina Court of Appeals reversed the order terminating respondent's parental rights. *In re D.L.W.,* ___ N.C. App. ___, ___, ___, ___, 773 S.E.2d 504, 505, 510, 511 (2015). The Court of Appeals determined that the findings regarding respondent did not support a conclusion that she neglected the juveniles pursuant to N.C.G.S. § 7B-1111(a)(1) because none of the findings addressed respondent's relationship, care, visitation, or support of her children; "[r]ather, they address[ed] [her] interactions and relationship with DSS and respondent-father." *Id*. at ___, 773 S.E.2d at 509. In addition, the Court of Appeals concluded that the trial court had no authority pursuant to N.C.G.S. § 7B-904 to order respondent to make reasonable progress to comply with several aspects of her case plan, including creating a budgeting plan and obtaining treatment

for social phobia, because there was no evidence that the social phobia or lack of a budgeting plan were causes of neglect or removal of the juveniles. *Id.* at ___, 773 S.E.2d at 509-10. Thus, the Court of Appeals determined that the trial court failed to make findings establishing either respondent's willfulness or her lack of reasonable progress to remedy the conditions that led to removal of the juveniles, pursuant to subdivision 7B-1111(a)(2). *Id.* at ___, 773 S.E.2d at 509-10. The Court of Appeals affirmed the portion of the trial court's order terminating father's parental rights. *Id.* at ___, 773 S.E.2d at 510-11. We allowed a petition for discretionary review filed by DSS and the juveniles' guardian ad litem.[2]

In their appeal petitioners contend that the Court of Appeals incorrectly determined that the trial court's findings failed to support a disposition of termination on the basis of neglect. Specifically, petitioners argue that the Court of Appeals erred when it concluded that the trial court's findings regarding domestic violence solely concerned respondent's relationship with the father and were not linked sufficiently to the care of the juveniles. We agree.

The procedure for termination of parental rights involves a two-step process. N.C.G.S. §§ 7B-1109, -1110 (2015). In the initial adjudication stage, the trial court must determine whether grounds exist pursuant to N.C.G.S. § 7B-1111 to terminate parental rights. *Id.*, § 7B-1109(e). If it determines that one or more grounds listed

---

[2] The father is not a party to this appeal.

in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights. *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614-15 (1997); N.C.G.S. § 7B-1110.

"At the adjudication stage, the party petitioning for the termination must show by clear, cogent, and convincing evidence that grounds authorizing the termination of parental rights exist." *In re Young*, 346 N.C. at 247, 485 S.E.2d at 614; *see also* N.C.G.S. § 7B-1109(f). An appellate court then considers whether the trial court abused its discretion in determining that termination of parental rights was in the best interests of the child. *In re L.M.T.*, 367 N.C. 165, 171, 752 S.E.2d 453, 457 (2013); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984).

Subdivision 7B-1111(a)(1) authorizes the trial court to terminate parental rights if "[t]he parent has abused or neglected the juvenile" as defined in N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1)(2015). Pursuant to section 7B-101, a neglected juvenile is one who "does not receive proper care, supervision, or discipline" from a parent or guardian, or one who "lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2015). Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent. *In re Ballard*, 311 N.C. 708, 713-15, 319 S.E.2d 227, 231-32 (1984).

Here the trial court stated its concerns about domestic violence between the parents when it first adjudicated the juveniles as neglected in May 2013. In the adjudication order, the court found that there were reports of "domestic violence between the parents that places the juveniles at risk. For example, [V.A.W.] has intervened when the parents are arguing." As a result, respondent was ordered by the court to "participate in a domestic violence counseling course."

Subsequently, at the termination hearing, the trial court received police reports and heard testimony regarding respondent's participation in multiple incidents involving domestic violence since the 2013 adjudication and removal of the juveniles. For example, the father testified that the bloody scratch on his face observed by law enforcement following an altercation at the home in March 2014 was inflicted by respondent. Although there was conflicting testimony regarding the details of these encounters,[3] the trial judge had the responsibility to "pass[ ] upon the

---

[3] As the Court of Appeals recognized in its opinion, respondent's testimony changed during the course of the termination hearing:

> She acknowledged having told police on 16 March 2014 that respondent-father "beat [her] up all the time," but claimed she had lied to the police in an attempt to get them to leave her residence. . . .
> After respondent father testified, the tenor of respondent-mother's testimony changed the following day. She disavowed her previous testimony as untrue and proceeded to describe a longstanding pattern of abusive, controlling behavior by respondent-father toward her.

*In re D.L.W.*, ___ N.C. App. at ___, 773 S.E.2d at 508 (alteration in original).

-11-

credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom." *Knutton v. Cofield,* 273 N.C. 355, 359, 160 S.E.2d 29, 33 (1968) (citation omitted).

In the order terminating respondent's parental rights, the trial court recited its previous findings from the adjudication order, made new findings regarding further incidents of domestic violence, and found that respondent had not articulated an understanding of what she learned in her domestic violence counseling sessions. The court found that respondent "continued in a relationship with the Respondent Father and there were significant issues regarding ongoing domestic violence." Ultimately, the court concluded as a matter of law that "[t]he parent has neglected the juveniles [within] the meaning of G.S. 7B-101 and there is a likelihood of repetition of such neglect if the juveniles are returned to her care."

Although the Court of Appeals concluded that the ongoing domestic violence was irrelevant to a determination of whether the juveniles were neglected, the trial court found that the violence in the home put the children at risk and that one of the juveniles had intervened in an argument between the parents. The trial court's findings support the conclusion that there would be a repetition of neglect based upon the juveniles' "liv[ing] in an environment injurious to [their] welfare." N.C.G.S. § 7B-101(15). Accordingly, we hold that the Court of Appeals erred by concluding that insufficient findings supported termination of respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1).

Next, petitioners argue that termination of parental rights also was warranted pursuant to N.C.G.S. § 7B-1111(a)(2). Petitioners contend that the Court of Appeals erred by holding that the trial court did not have authority to order respondent to comply with several specific requirements in her case plan, such as creating a budgeting plan. As a result, petitioners contend that the Court of Appeals incorrectly concluded that respondent's failure to comply with these requirements could not justify the termination of her parental rights. We agree.

Subdivision 7B-1111(a)(2) allows a court to terminate parental rights if the parent

> has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. Provided, however, that no parental rights shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.

*Id.* § 7B-1111(a)(2) (2015). Subdivision 7B-904(d1)(3) authorizes the trial court to order that a parent "[t]ake appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent, guardian, custodian, or caretaker." *Id.* § 7B-904(d1)(3) (2015).

The findings in the adjudication order indicate that domestic violence, as well as a lack of consistent and adequate housing and the parents' inability to meet the

minimal needs of the juveniles, were reasons for their removal and their adjudication as neglected. In one finding the trial court noted that respondent "has two other children who are not in her placement due to her inability to provide stability." Following this statement, the trial court made findings describing how respondent had been employed for ten months, but reported that she "did not have enough money to maintain a household since becoming a permanent employee on February 18, 2013." The trial court further found that respondent had trouble providing basic necessities for the three juveniles and was residing with them "at times in a van in the woods."

At the termination hearing, the trial court heard testimony that respondent did not know why she could not pay bills and could not account for where her money was going, yet she would buy "figurines on lay-a-way," and take half days off from work to get her hair done, and the father would take "hundreds and hundreds of dollars from [her]." Respondent did not know what the father did with the money but believed he used much of it to play "a lot of lottery." The trial court found that the parents' "failure to appropriately budget their funds . . . continued to result in instability." Because the conditions and instability described in the findings appeared to be worsened by the parents' failure to make appropriate use of incoming funds to meet the needs of the juveniles, it was entirely appropriate for the court to have ordered respondent to create a budgeting plan. Respondent's failure to meet this requirement "despite being employed for periods of more than one month" was

among the findings in the termination order and was a proper basis for terminating her parental rights for failing to make progress in correcting a condition that led to the removal of the juveniles.

In the termination order, the court also found that respondent had not maintained consistent housing since the juveniles were removed and adjudicated as neglected, noting that respondent had been evicted from multiple residences "for nonpayment of rent despite the fact that, at times during residing at the residences, the parents were employed making between $11.00 and $13.00 an hour for 40-60 hours a week." The court found that respondent "was not stable, would pay rent for one month but not subsequently without good reason and she does not currently have appropriate housing" in that she was residing in an emergency shelter. Further, the court noted that respondent lost employment because of incarceration, which respondent testified was a result of a domestic violence "incident that happened." The court also found that respondent had not sought treatment for a "social phobia" diagnosis following her court-ordered mental health assessment, that she continued to drive without a valid North Carolina driver's license, and that she "was charged with careless and reckless and fleeing to elude still [sic]."

Respondent argues that the trial court's findings are not sufficiently linked to conditions that led to removal of the juveniles or indicate a likelihood of future neglect, and instead are more related to poverty. We disagree. These findings demonstrate that respondent's failure to correct the conditions that led to the removal

of the juveniles was not simply the result of poverty. Respondent had income and did not know why she could not pay her bills, but she refused to comply with the trial court's order that she create a budgeting plan. Respondent continued in a relationship fraught with domestic violence, repeatedly participated in additional acts of domestic violence, caused injury to the father and damage to personal property, and was incarcerated as a result of her conduct.[4] We conclude that the trial court's findings supported its conclusion that respondent failed to make reasonable progress under the circumstances toward correcting conditions that led to the removal of the juveniles.

For these reasons, we hold that sufficient findings supported termination of respondent's parental rights pursuant to subdivisions 7B-1111(a)(1) and (a)(2). Having properly found that these grounds existed, we cannot conclude, based upon these circumstances, that the trial court abused its discretion when it determined that termination of respondent's parental rights was in the best interest of the juveniles. Accordingly, the judgment of the Court of Appeals is reversed as to the

---

[4] We note that the Court of Appeals concluded that respondent's failure to obtain treatment for her "social phobia" could not be considered as a factor in determining whether respondent failed to make progress toward correcting the conditions that led to removal of the juveniles. The trial court did not state that there was any link between respondent's "social phobia" and the conditions that led to removal and there is no indication in the trial court's order that it weighed respondent's failure to treat her "social phobia" as a factor in its decision. Instead, the trial court simply mentioned the issue of "social phobia" in passing before basing its ultimate determination on respondent's failure to obtain housing, failure to obtain transportation, failure to create a budgeting plan, driving without a valid license, and continuing involvement in domestic violence.

issue before this Court on appeal, and the trial court's order terminating respondent's

parental rights is reinstated.


REVERSED.