IN THE SUPREME COURT OF NORTH CAROLINA

No. 339A19

Filed 11 December 2020

IN THE MATTER OF: D.M., M.M., D.M.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) and on writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review orders entered on 15 April 2019 and 18 June 2019 by Judge Shamieka L. Rhinehart in District Court, Durham County. This matter was calendared for argument in the Supreme Court on 23 November 2020, but was determined upon the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Elizabeth Kennedy-Gurnee for petitioner-appellee Durham County Department of Social Services; and William A. Blancato for appellee Guardian ad Litem.*

*Sean P. Vitrano for respondent-appellant father.*

*Christopher M. Watford for respondent-appellant mother.*

ERVIN, Justice.

Respondent-father Marcus B. and respondent-mother Danita M. appeal from orders entered by the trial court terminating their parental rights in their minor children D.M., M.M., and D.M.[1] After careful consideration of the arguments that

---

[1] D.M., M.M., and D.M. will be referred to throughout the remainder of this opinion as, respectively, "David," "Michael," and "Danielle," which are pseudonyms used to protect the juveniles' identities and for ease of reading.

have been advanced in the parents' briefs in light of the record and the applicable law, we affirm the trial court's termination orders.

## I. Factual Background

On 25 August 2015, the Durham County Department of Social Services filed a petition alleging that David and Michael were neglected juveniles. In its petition, DSS alleged that, from 22 May 2014 to 24 June 2015, the family had received in-home services that were intended to address the parents' problems with domestic violence and substance abuse. However, respondent-father failed to engage in services that were intended to address issues relating to domestic violence, mental health, or substance abuse during this time. Although the last documented incident of domestic violence involving the parents had occurred on 18 January 2015, a social worker observed "aggressive, controlling speech" that respondent-father had directed toward respondent-mother on three separate occasions between 6 July 2015 and 14 August 2015.

DSS further alleged that, on 5 July 2015, it had received a new report that the parents had left David and Michael, who were three and one years old, respectively, at the time, in the family home by themselves. According to DSS, the family home was "regularly filthy, cluttered, and unsanitary with open garbage and roaches on the floor." Respondent-mother told representatives of DSS that she absented herself from the home every evening until it became time for the children to go to bed because respondent-father would drink alcohol, become confrontational, and act in a verbally

aggressive manner. Although respondent-mother was five months pregnant with her eleventh child, she admitted to DSS representatives that she had smoked marijuana until relatively recently. On 14 August 2015, respondent-mother left the family home with David and Michael and entered a domestic violence shelter.

On 22 October 2015, Judge William A. Marsh, III, entered an order determining that David and Michael were neglected juveniles in that they "are not receiving proper care or supervision or live in an environment injurious to their welfare." Judge Marsh ordered that David and Michael remain in respondent-mother's custody on the condition that she provide them with a safe and stable living environment and abstain from being with respondent-father in the presence of the children. In addition, Judge Marsh prohibited the parents from residing together with the children. As a precondition for allowing the parents to reunify with the children, Judge Marsh ordered respondent-mother to ensure that the children were properly supervised at all times; to participate in and complete domestic violence services and follow all recommendations; refrain from engaging in physical altercations with respondent-father; actively participate in mental health and substance abuse services and comply with all resulting recommendations; submit to random drug screens; complete a parenting program; and obtain and maintain safe and stable housing. Similarly, Judge Marsh ordered respondent-father to ascertain the amount of child support that he should be required to pay through the IV-D program; ensure that the children were properly supervised at all times; participate

and complete anger management services through the Duke Addictions program; refrain from engaging in physical altercations with respondent-mother; comply with all substance abuse and mental health recommendations that he received from Duke Addictions; submit to random alcohol screens; complete a parenting program; and obtain and maintain gainful employment or some other lawful source of income.

On 8 December 2015, respondent-mother gave birth to Danielle. On 6 July 2016, respondent-mother was arrested and charged with driving while impaired. As a result, David and Michael were placed in the temporary legal custody of respondent-father by consent on 13 July 2016.

On 20 September 2016, DSS filed a petition alleging that Danielle was a neglected and dependent juvenile and obtained the entry of an order placing David, Michael, and Danielle in nonsecure custody. In its petition, DSS alleged that, on the evening of 19 September 2016, the parents had been drinking and began arguing. At 6:00 a.m., respondent-father awoke and could not locate David and Michael. After law enforcement officers had been notified, David and Michael were found at the home of an individual who had been authorized to supervise respondent-mother's visits with the children and who reported that she had "heard something at the door"; that "it was the children trying to get in"; that, upon opening the door, she saw "a small red car drive away;" and that, while she could not identify the vehicle's driver, "[respondent-mother] is known to drive a small red car." At the time that the parents

arrived at the police station, they were observed to be under the influence of an impairing substance and placed under arrest.

The issues raised in the 20 September 2016 petition came on for hearing before Judge Marsh on 10 November 2016. On 10 November 2016, Judge Marsh entered an order determining that Danielle was a neglected and dependent juvenile. In addition, Judge Marsh found that the parents had completed a parenting program, that respondent-mother was not currently engaged in substance abuse and mental health treatment, and that respondent-father needed to engage in substance abuse treatment. As a precondition for allowing the parents to reunify with Danielle, the trial court ordered respondent-mother to resume her participation in mental health therapy; ensure that Danielle was properly supervised at all times; refrain from engaging in physical altercations with respondent-father; actively engage in mental health and substance abuse services and follow any resulting recommendations; submit to random drug screens; maintain safe and stable housing; and participate in supervised visitation with Danielle. Similarly respondent-father was ordered to ensure that Danielle was properly supervised at all times; refrain from engaging in physical altercations with respondent-mother; maintain gainful employment or some other source of lawful income; maintain stable housing; refrain from the use of impairing substances; and complete services with Duke Addictions.

After a permanency planning hearing held on 2 February 2018 and 27 March 2018, the trial court entered an order on 5 June 2018. In its order, the trial court

found that respondent-mother had completed active parenting and anger management classes in September 2017 and that respondent-mother had been referred to a family violence case manager with DSS on 6 September 2017, had been referred for domestic violence counseling, and was awaiting the assignment of a counselor. The trial court further found that respondent-mother had begun participating in Vision's Substance Abuse Comprehensive Outpatient Treatment on 31 October 2016 and that, after several negative urine screens, it had been determined that respondent-mother no longer needed these services. In addition, the trial court found that respondent-mother had been referred to Carolina Outreach on 9 November 2017 with a recommendation that she begin weekly occupational therapy and medication management. However, respondent-mother had only attended three therapy sessions since January 2018 and was not consistently engaged in the medication management process. In view of the fact that respondent-mother was participating in substance abuse services at Visions, DSS had not received random drug screening information and had referred respondent-mother to Duke Family Care for that purpose. On 26 March 2018, respondent-mother had begun full-time employment as a housekeeper at a hotel. Finally, the trial court found that it was not possible for the children to be returned to respondent-mother in the near future because she was still engaged in mental health treatment and attempting to secure stable housing and employment.

In the same order, the trial court found that respondent-father had been working three days a week at a Bojangles restaurant and was earning a weekly amount of $200 in addition to the $1,060 in Supplemental Security Income that he received each month. Although respondent-father had been participating in the Substance Abuse Comprehensive Outpatient Treatment program, Visions had determined that he was no longer eligible to receive their services for insurance-related reasons in November 2017. In addition, even though respondent-father had been referred to B & D Integrated Solutions, he had not been receiving services from that entity. Respondent-father had completed a domestic violence assessment and active parenting and anger management classes in September 2017. On the other hand, respondent-father had not been attending Alcoholics Anonymous or Narcotics Anonymous meetings. The trial court further found that it was not possible for the children to be returned to respondent-father because he had not been consistently participating in mental health treatment and lacked stable housing. In addition, the trial court expressed "uncertain[ty]" concerning the level of sobriety that respondent-father had achieved and maintained given that respondent-father had not participated in random drug screening. As a result, based upon all of these considerations, the trial court established a primary permanent plan for all three children of reunification, with a secondary permanent plan of adoption. After a permanency planning hearing held on 25 June 2018, the trial court entered an order

instructing respondent-mother to present negative drug and alcohol screens and requiring respondent-father to re-engage in substance abuse treatment.

On 20 June 2018, DSS filed a motion seeking to have the parents' parental rights in the children terminated based upon neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home, N.C.G.S. § 7B-1111(a)(2); and dependency, N.C.G.S. §. 7B-1111(a)(6). The termination petition came on for hearing before the trial court in early 2019, with the adjudicatory phase of the proceeding having been conducted on 20 and 21 February 2019 and 20 and 21 March 2019 and with the dispositional phase of the proceeding having been conducted on 16 and 17 April 2019. On 15 April 2019, the trial court entered an adjudication order determining that the parents' parental rights were subject to termination on the basis of neglect and willful failure to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home. On 18 June 2019, the trial court entered a dispositional order concluding that termination of the parents' parental rights would be in the children's best interests and terminating the parents' parental rights in the children. *See* N.C.G.S. § 7B-1110(a) (2019).

The parents noted an appeal to this Court from the trial court's termination orders. On 22 November 2019, the trial court entered an order dismissing respondent-mother's appeal on the grounds that she had failed to attach a certificate of service to her notice of appeal. On 11 December 2019, respondent-mother filed a

petition seeking the issuance of a writ of certiorari authorizing review of the trial

court's termination orders on the merits. On 27 December 2019, this Court allowed

respondent-mother's certiorari petition.

## II. Substantive Legal Analysis

In seeking relief from the trial court's termination orders before this Court, the

parents contend that the trial court erred by determining that their rights in the

children were subject to termination for neglect, N.C.G.S. § 7B-1111(a)(1), and willful

failure to make reasonable progress, N.C.G.S. § 7B-1111(a)(2). "[A]n adjudication of

any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of

parental rights." *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019). For that

reason, we begin our analysis by considering whether the trial court erred by

determining that the parents' parental rights in the children were subject to

termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

Termination of parental rights proceedings involve the use of a two-stage

process. N.C.G.S. §§ 7B-1109, 1110 (2019). "At the adjudicatory stage, the petitioner

bears the burden of proving by 'clear, cogent, and convincing evidence' the existence

of one or more grounds for termination under section 7B-1111(a) of the General

Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S.

§ 7B-1109(f) (2019)). "If [the trial court] determines that one or more grounds listed

in [N.C.G.S. §] 7B-1111 are present, the court proceeds to the dispositional stage, at

which the court must consider whether it is in the best interests of the juvenile[s] to

terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110).

"This Court reviews a trial court's adjudication decision pursuant to N.C.G.S. § 7B-1109 'in order to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law,' with the trial court's conclusions of law being subject to de novo review on appeal." *In re N.D.A.*, 373 N.C. 71, 74, 833 S.E.2d 768, 772 (2019) (citations omitted). "Findings of fact not challenged by respondent[s] are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019) (citing *In re Moore*, 306 N.C. 394, 403−04, 293 S.E.2d 127, 132 (1982)).

"[A] trial judge may terminate a parent's parental rights in a child in the event that it finds that the parent has neglected his or her child in such a way that the child has become a neglected juvenile as that term is defined in N.C.G.S. § 7B-101." *In re M.A.*, 374 N.C. 865, 869, 844 S.E.2d 916, 920 (2020) (citing N.C.G.S. § 7B-1111(a)(1) (2019)). A neglected juvenile is "[a]ny juvenile less than 18 years of age . . . whose

parent . . . does not provide proper care, supervision, or discipline" or "who lives in an

environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).

> "[I]n deciding whether a child is neglected for purposes of
> terminating parental rights, the dispositive question is the
> fitness of the parent to care for the child 'at the time of the
> termination proceeding.' " *In re L.O.K.*, 174 N.C. App. 426,
> 435, 621 S.E.2d 236, 242 (2005) (quoting *In re Ballard*, 311
> N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (emphasis
> omitted)). In the event that "a child has not been in the
> custody of the parent for a significant period of time prior
> to the termination hearing, 'requiring the petitioner in
> such circumstances to show that the child is currently
> neglected by the parent would make termination of
> parental rights impossible.' " *Id.* (citation omitted). In
> such circumstances, the trial court may find that a parent's
> parental rights in a child are subject to termination on the
> grounds of neglect in the event that the petitioner makes
> "a showing of past neglect and a likelihood of future neglect
> by the parent." *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d
> at 167 (citation omitted).

*In re N.D.A.*, 373 N.C. at 80, 833 S.E.2d at 775.[2] "When determining whether future

neglect is likely, the trial court must consider evidence of changed circumstances

occurring between the period of past neglect and the time of the termination hearing."

*In re Z.A.M.*, 374 N.C. 88, 95, 839 S.E.2d 792, 797 (2020) (citing *In re Ballard*, 311

N.C. 708, 715, 319 S.E.2d 227, 232 (1984)). "A parent's failure to make progress in

---

[2] As we have noted today in our opinion in *In re R.L.D.*, No. 122A20, slip op. at 5 &
n.3 (N.C. Dec. 11, 2020), a showing of past neglect and a probability of future neglect is not
necessary to support a determination that a parent's parental rights in a juvenile are subject
to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) in light of the fact
that such a determination is also permissible in the event that there is a showing of current
neglect.

completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. at 870, 844 S.E.2d at 921 (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637, 810 S.E.2d 370, 373 (2018)).

In Finding of Fact No. 8,[3] the trial court found that the family had received in-home services from 22 May 2014 to 24 June 2015 in order to address the parents' substance abuse and domestic violence problems. Subsequently, all three children were found to be neglected juveniles. In Finding of Fact Nos. 10 and 11, the trial court found that David and Michael had been removed from respondent-mother's care and placed in the temporary custody of respondent-father on 13 July 2016 as a result of the fact that respondent-mother had been charged with driving while subject to an impairing substance. In the aftermath of this determination, the parents were allowed to be in each other's presence as long as they were able to refrain from engaging in domestic violence and utilizing impairing substances. In Finding of Fact No. 12, the trial court found that, on 19 September 2016, the children came into DSS custody based upon improper supervision, the parents' substance abuse problems, and the level of conflict between the parents.

In Finding of Fact Nos. 14 through 25 and Finding of Fact No. 31, the trial court described respondent-mother's progress, or lack thereof, in addressing the

---

[3] The references to specific findings of fact contained in the remainder of this opinion are all to the adjudication order that the trial court entered on 15 April 2019 given that all of the parents' challenges to the trial court's decision to terminate their parental rights in the children are directed to that order.

barriers to reunification that had been found to exist, which included substance abuse problems, mental health concerns, unstable housing, domestic violence issues, and the lack of appropriate parenting skills. In Finding of Fact Nos. 23 through 32, the trial court described respondent-father's progress, or lack thereof, in addressing the barriers to reunification that had been found to be exist, which included substance abuse problems, mental health concerns, domestic violence issues, the lack of stable housing and gainful employment, and the absence of appropriate parenting skills. The trial court found that, "[b]ased on the fact of the lack of insight as it relates to [d]omestic [v]iolence issues, inconsistency in mental health services, lack of stable housing and lack of consistency in random drug screens, . . . the risk of harm to these children still exists" and "the children would live in an environment injurious to their welfare if returned to their parents." As a result, the trial court determined that "[t]here is a reasonable probability of repetition of neglect" if the children were returned to their parents' care.

### A. Respondent-Father's Appeal

Although respondent-father has not questioned the propriety of the trial court's determination that the children had been the subject of a prior adjudication of neglect, he does challenge the lawfulness of the trial court's decision that there was a reasonable probability that the neglect that the children had experienced would be repeated in the event that they were returned to his care in light of his alcohol abuse, the existence of domestic violence concerns, the inconsistent level of mental health

services that he had received, and the fact that he lacked stable housing. More specifically, respondent-father asserts that some of the trial court's findings of fact lack sufficient evidentiary support and that the remaining findings do not suffice to establish that there was a reasonable likelihood that the neglect that the children had experienced would be repeated if they were returned to his care.

As the trial court's order reflects, respondent-father has an extensive history of substance abuse and involvement in domestic violence dating back to May 2014. It is undisputed that, in September 2016, all three children were taken into DSS custody as a result of the parents' failure to provide them with proper supervision, the parents' abuse of impairing substances, and the existence of conflict between the parents. After carefully considering the record developed before the trial court, we are satisfied that the trial court's findings suffice to support its determination that there was a likelihood that the children would be neglected in the event that they were returned to the parents' care.

As an initial matter, respondent-father argues that the portion of Finding of Fact No. 36(a) stating that his "last random [drug] screen was back in May 2018 and he is currently not receiving treatment for substance abuse" lacks sufficient record support. Respondent-father argues, in reliance upon his own testimony at the termination hearing, that he had returned to Visions about three weeks earlier and that he had been participating in a substance abuse aftercare program and drug screens as part of that process. According to respondent-father, the record contains

evidence tending to show that his last assessment and alcohol screening, which was negative, had occurred on 10 January 2019.

After carefully reviewing the record evidence, we are unable to conclude that the challenged portion of Finding of Fact 36(a) is supported by clear, cogent, and convincing evidence. As we have already noted, the adjudicatory phase of the termination hearing commenced on 20 February and concluded on 21 March 2019. For that reason, a month elapsed between the date upon which the termination hearing began and the date upon which it concluded. At the 21 February 2019 hearing date, Sheena Wagner, a substance abuse counselor with the Duke Family Care Program, testified that she had last obtained a drug screen from respondent-father in May 2018 and that she had closed respondent-father's case in September 2018 in light of his failure to submit to three random drug screens. A closure report generated by Duke Family Care on 18 September 2018 and admitted into evidence confirmed this portion of Ms. Wagner's testimony. In addition, Ms. Wagner testified that she had conducted a reassessment for respondent-father in January 2019 and that he had reported his participation in the aftercare program at Visions on that occasion. After recommending that respondent-father continue to participate in that aftercare program, Ms. Wagner contacted Visions and learned that respondent-father "had not been engaged for some months."

On the other hand, respondent-father testified at the 20 March 2019 hearing that he had returned to Visions aftercare just a few weeks earlier. The trial court

appears to have found this testimony to be credible in Finding of Fact No. 27, in which it stated that respondent-father had "returned [ ] to Visions approximately three weeks ago." In addition, a Duke Family Care progress summary that was accepted into evidence at the termination hearing indicates that respondent-father had submitted to a drug screen in January 2019 and had tested negative for the presence of all substances. The contents of this progress summary were reflected in Finding of Fact Nos. 24 and 29. As a result, in light of the fact that the trial court's findings generally appear to accept the validity of respondent-father's contention that he had recently returned to participation in substance abuse treatment and had tested negatively shortly before the end of the termination hearing, we disregard the challenged portion of Finding of Fact 36(a) in evaluating the validity of the trial court's determination that respondent-father's parental rights in the children were subject to termination on the basis of neglect in light of his alleged failure to adequately address his substance abuse problems. *See In re J.M.*, 373 N.C. 352, 358, 838 S.E.2d 173, 177 (2020) (disregarding a finding of fact that lacked sufficient evidentiary support in determining whether the trial court had properly found the existence of grounds for terminating a parent's parental rights).

In addition to challenging the sufficiency of the record support for certain of the trial court's findings of fact, respondent-father argues that the trial court's remaining findings of fact do not support the trial court's determination that there is a reasonable probability of repetition of neglect if the children were returned to his

care based upon his failure to adequately address his alcohol abuse problems. As the trial court's unchallenged findings and the record evidence reflect, however, respondent-father had an extensive history of substance abuse; the parents had received in-home services from 22 May 2014 to 24 June 2015 for the purpose of addressing problems relating to substance abuse and domestic violence; and the children had been removed from the home on 19 September 2016 after an evening during which the parents had been arguing and drinking alcohol. In addition, the trial court's findings and the record evidence reflect that respondent-father's treatment at Duke Family Care was terminated in September 2018 after Ms. Wagner had been unable to make contact with him for three consecutive months. Although respondent-father does appear to have completed a reassessment and drug screen in January 2019, his most recent drug screen prior to that date had been approximately eight months earlier. In addition, even though the record contains evidence tending to show that respondent-father had begun participating in a substance abuse aftercare program at Visions before the conclusion of the termination proceeding, his involvement in that program had only commenced after the motion to terminate his parental rights in the children had been filed and the termination hearings had actually begun. A careful review of the trial court's findings and the record evidence demonstrates that the record contains ample support for the trial court's determination that, in light of respondent-father's "extensive substance abuse histor[y]" and his inconsistent involvement in the drug screening process,

respondent-father had failed to establish "the status or durability" of his sobriety and to mitigate the risks that continued alcohol abuse might pose for the children. *See In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68 (stating that the trial judge has the responsibility for evaluating the credibility and weight to be afforded to the evidence and to determine the reasonable inferences that should be drawn from the credible evidence).

In addition, respondent-father argues that the trial court had erred by determining that it was likely that the neglect that the children had previously experienced would recur in the event that they were returned to his care on the basis of the trial court's determination that he had failed to adequately address the issue of domestic violence. In respondent-father's view, the trial court lacked any basis in the evidentiary record for making Finding of Fact No 36(b), in which the trial court determined that, even though "there may be no reported domestic violence incidents between these parties since 2016, this does not mean to this Court that the mother or father have expressed meaningful insight about how domestic violence impacts them or could cause harm to their children." More specifically, respondent-father contends that he had not been called upon to testify about his understanding of the impact that domestic violence would have upon the parents or the children, that no expert witness had testified that he was oblivious to the adverse effects that domestic violence could cause, and that the manner in which the trial court had addressed this issue in its order had impermissibly shifted the burden of proof with respect to the

domestic violence issue away from DSS and onto him. Once again, we are not persuaded by respondent-father's argument.

In its termination order, the trial court made unchallenged findings that the parents had an extensive history of domestic violence dating back to May 2014, with DSS having taken the children into its custody on 19 September 2016 as the result, in part, of the "arguing of the parents." In addition, the trial court judicially noticed the finding contained in the initial adjudication order "that these children are neglected due to the domestic violence between both the parents." The trial court further found that respondent-father had been referred to Penny Dixon, a contractor for DSS associated with the Durham Crisis Response Center, for a domestic violence assessment and that, even though respondent-father had completed the assessment process on September 2017, he had failed to comply with Ms. Dixon's recommendation that he participate in long-term individual counseling, with respondent-father having claimed in his testimony at the termination hearing that he had been waiting on a return call from Ms. Dixon. As a result of the fact that respondent-father "did not exercise any initiative to follow through with [Ms. Dixon,]" the trial court found that there had been "no expressed insight from the father about how domestic violence impacts him[.]"

Respondent-father's assertion that the trial court had no basis for finding that he had not attained an understanding of the potential ill effects of domestic violence in the absence of an admission on his own part or testimony to that effect from an

expert witness lacks merit. In view of the fact that the record contains evidence tending to show an extensive history of domestic violence between the parties dating back to May 2014, the trial court could have reasonably found that respondent-father's failure to comply with the recommendation that he participate in long-term, individual counseling for the purpose of addressing the issue of domestic violence was tantamount to a failure on his part to adequately recognize and address the role that domestic violence had played in his own life and that of his children. In addition, rather than improperly shifting the burden of proof with respect to domestic violence from DSS to respondent-father, the challenged portion of the trial court's termination order merely noted that respondent-father had failed to successfully rebut the evidence that DSS had presented in support of its contention that he had failed to adequately address his domestic violence issues. *See, e.g., In re Clark*, 72 N.C. App. 118, 125, 323 S.E.2d 754, 758 (1984) (holding that, instead of impermissibly shifting the burden of proof from the petitioner to the parent, the challenged finding of fact was "nothing more than an accurate statement of the procedural stance of the case" and simply stated that "the respondents did not produce evidence that contradicted the allegations set forth in the petition").

Similarly, respondent-father contests the validity of the trial court's determination that there was a probability that the neglect that the children had previously experienced would be repeated in the event that they were returned to his care given his failure to adequately address concerns relating to his mental health

and housing stability. The trial court's findings concerning respondent-father's failure to address the issues of substance abuse and domestic violence, which were the two central problems that led DSS to intervene in the life of the family beginning in May 2014 and that resulted in the children's removal from the family home in September 2016, are sufficient, standing alone, to support the trial court's determination that there was a likelihood that the children would be neglected in the future in the event that they were returned to respondent-father's care. *See In re M.A.*, 374 N.C. at 870, 844 S.E.2d at 921 (holding that, even though the respondent claimed to have made reasonable progress in addressing the issues of substance use, domestic violence, and income and housing stability, the trial court's findings concerning the respondent's failure to adequately address the issue of domestic violence, which was the primary reason that the children had been removed from the home, were, standing alone, sufficient to support a determination that a repetition of neglect was likely to occur). For that reason, we will refrain from addressing respondent-father's remaining challenges to the trial court's determination that his parental rights in the children were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1), including those relating to mental health and housing concerns. As result, given that the trial court did not err by determining that respondent-father's parental rights in the children were subject to termination on the basis of neglect; that the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, *see In re A.R.A.*, 373

N.C. 190, 194, 835 S.E.2d 417, 421 (2019); and that respondent-father has not challenged the validity of the trial court's best interests determination, we affirm the trial court's termination order with respect to respondent-father.

### B. Respondent-Mother's Appeal

Like respondent-father, respondent-mother acknowledges that the children had previously been adjudicated to be neglected juveniles while arguing that the trial court erred by finding that there was a likelihood that the earlier neglect would be repeated in the event that the children were returned to her care. In support of this contention, respondent-mother challenges the sufficiency of the evidentiary support for certain of the trial court's findings of fact and asserts that there had been a "marked change in [her] circumstances" from the time of the children's removal from her home to the time of the termination hearing. After a thorough review of the record, we are convinced that the trial court's findings regarding respondent-mother's failure to adequately address the issues of substance abuse and domestic violence have sufficient evidentiary support and support its determination that there was a likelihood of future neglect in the event that the children were returned to her care.

As an initial matter, respondent-mother challenges a portion of Finding of Fact No. 36(c), in which the trial court found that it is "uncertain as to the status and durability of [respondent-mother's] sobriety and . . . that the risk of harm to the children has not been removed by these parents," as lacking in sufficient evidentiary support. According to respondent-mother, the quoted portion of the trial court's

adjudication order is "not an actual finding" given that the trial court failed to carry out its duty to "ascertain the truth from the various circumstances" and has done nothing more than state that "the court is not certain as to what to find."

After examining Finding of Fact No. 36(a) in its entirety, we have no hesitation in concluding that the language upon which respondent-mother's argument rests states a logical inference that the trial court chose to make from other evidentiary facts. *See In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997) (stating that "[a]ny determination reached through 'logical reasoning from evidentiary facts' is more properly classified a finding of fact"). At the beginning of Finding of Fact 36(a), the trial court provided a detailed discussion of respondent-mother's lack of progress in addressing her substance abuse problems. Among other things, the trial court found that respondent-mother's case at Duke Family Care had been closed in September 2018 after Ms. Wagner had been unable to contact respondent-mother for three consecutive months. In addition, the trial court found that, while respondent-mother tested negatively when screened for alcohol use in January 2019, her most recent test result before that date had been provided in May 2018. Finally, the trial court found as a fact that:

> both of these parents have extensive substance abuse histories and because of a lack of being consistent in participating in random drug screens for alcohol, this Court is uncertain as to the status and durability of their sobriety and finds that the risk of harm to the children has not been removed by these parents; when the parents are under the influence they create an injurious environment

where they become incapable of providing proper supervision and care.

Thus, when considered in its entirety, Finding of Fact No. 36(a) consists of (1) a description of respondent-mother's extensive history of substance abuse and her inconsistent record of participating in required drug screens and (2) a reasonable inference that the extent and duration of respondent-mother's sobriety had not been demonstrated. *See In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68 (holding that the trial court "had the responsibility to 'pass upon the credibility of the witnesses and the weight to be given to their testimony and the reasonable inferences to be drawn therefrom' " (quoting *Knutton v. Cofield*, 273 N.C. 355, 359, 160 S.E.2d 29, 33 (1968))). As a result, we hold that Finding of Fact No. 36(a) constitutes a proper finding on the part of the trial court.

In addition, respondent-mother argues that Finding of Fact No. 36(a) lacks sufficient record support. In support of this assertion, respondent-mother relies upon findings of fact made in the 5 June 2018 permanency planning order that she had several negative urine screens from 31 August 2017 to 20 October 2017, that she had a negative drug screen on 27 March 2018, and that she submitted to drug screens during her period of relapse in April and June 2018 and upon an unchallenged finding of fact contained in the trial court's termination order that she provided a negative drug screen in January 2019. In further support of her challenge to the sufficiency of the evidentiary support for Finding of Fact No. 36(a), respondent-mother points to

the results of drug screens administered by her probation officer in "mid-late 2018" that did not test for alcohol. Finally, respondent-mother directs our attention to testimony from her probation officer that she had regularly met with respondent-mother since September 2018 without detecting any odor of alcohol or seeing any evidence of alcohol use and that the records maintained by DSS concerning her visits with the children from September 2018 to February 2019 did not contain a single indication that respondent-mother smelled of alcohol or appeared to be intoxicated.

The fundamental problem with respondent-mother's challenge to the sufficiency of the evidentiary support for Finding of Fact No. 36(a) is that the trial court never found that respondent-mother had ever failed or refused to submit to drug screens or had ever had negative results during the drug screening process. Similarly, the trial court never found that respondent-mother had or had not been observed to be under the influence of alcohol at any time since September 2018. Instead, Finding of Fact No. 36(a) simply states that respondent-mother had been inconsistent in her participation in the drug screening process. In unchallenged Finding of Fact No. 23, the trial court found that, while respondent-mother participated in two drug screens in April and May of 2018, she "did not get randomly screened from June to December 2018." In addition, respondent-mother missed a drug screening appointment scheduled for 30 July 2018, with her Duke Family Care case having been closed in September 2018 after Ms. Wagner could not contact respondent-mother for three consecutive months. As a result, we conclude that

Finding of Fact No. 36(a) has ample evidentiary support. *See In re B.O.A.*, 372 N.C. at 379, 831 S.E.2d at 310 (stating that a "finding that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding) (citing *In re Moore*, 306 N.C. at 403–04, 293 S.E.2d at 132).

Next, respondent-mother argues that the trial court erred by finding that there was a likelihood that the neglect that the children had previously experienced would be repeated in light of the fact that she had demonstrated the existence of a marked change in circumstances relating to her substance abuse problems at the time of the termination hearing. The argument that respondent-mother makes in support of this contention relies upon an attempt to shift the focus from her inconsistency in submitting to random drug screens and a claim that DSS had failed to prove that she had consumed alcohol after the summer of 2018. The record does, of course, reflect that respondent-mother last tested positive for the presence of alcohol in April of 2018 and that she had tested negative for the presence of all controlled substances, including alcohol, in January 2019. On the other hand, the trial court's unchallenged findings of fact establish that respondent-mother did not submit to random drug screens from June to December 2018 and that her case with Duke Family Care had been closed in September 2018 after she failed to respond to Ms. Wagner's attempts to make contact with her. In light of respondent-mother's extensive substance abuse history and her failure to consistently participate in the drug screening process, we

hold that the trial court had an ample evidentiary basis for determining that respondent-mother had failed to achieve a stable or durable state of sobriety sufficient to eliminate the risk of harm to her children.

In addition to her challenge to the trial court's treatment of her struggles with substance abuse, respondent-mother objects to the manner in which the trial court addressed the issue of her involvement with domestic violence. As an initial matter, we note that the trial court's unchallenged findings of fact establish that respondent-mother had completed a domestic violence assessment in September of 2017, at which it had been recommended that respondent-mother complete domestic violence counseling, and that respondent-mother had never presented a certificate of completion indicating that she had obtained the recommended counseling. In addition, the trial court's findings reflect that respondent-mother had received counseling at the Durham Crisis Response Center from May 2018 to December 2018.

According to respondent-mother, Finding of Fact No. 20, in which the trial court stated that the counseling sessions in which respondent-mother participated at the Durham Crisis Response Center "do not contain[ ] counseling particularly on domestic violence," lacks sufficient evidentiary support. Respondent-mother makes a similar challenge to Finding of Fact No. 36(b), in which the trial court found, in pertinent part, that:

> [respondent-mother] has an extensive history of being in domestic violence relationships with her partners which stems from at least 1997 when a former partner fractured

> her bone. . . . The court takes judicial notice of the findings of fact in the adjudication order that these children are neglected due to the domestic violence between both the parents. The Court finds that there may be no reported domestic violence incidents between these parties since 2016, this does not mean to this Court that [respondent-mother] or [respondent-father] have expressed meaningful insight about how domestic violence impacts them or could cause harm to their children. The court reviewed [respondent-mother's exhibit #4 — Assessment from the Durham Crisis Response Center]; [respondent-mother] discussed in one session about maintaining sobriety, the care of her children in foster care, how to handle grief and to get her children back.

In respondent-mother's view, the trial court erred by finding that her counseling sessions at the Durham Crisis Response Center did not address domestic violence issues.

In support of her contention that she had received domestic violence counseling at the Durham Crisis Response Center, respondent-mother points to an intake form in which she indicated that she wanted to address "domestic violence, coping skills" and to counseling notes that mention issues relating to the safety of the children, the management of grief, an analysis of past deficiencies in the decisions that she had made, and the need to control her substance abuse. According to respondent-mother, her counselor at the Durham Crisis Response Center "would have used these topics to relate to domestic violence or would have redirected [respondent-mother.]"

In its adjudication order, the trial court stated that it had reviewed respondent-mother's assessment from the Durham Crisis Response Center and the records

relating to respondent-mother that had been generated by that entity relating to respondent-mother through December 2018. The counseling case notes indicate that various topics had been discussed during the counseling that respondent-mother had received at the Durham Crisis Response Center, such as "concerns about safety of [the] children in foster care," respondent-mother's desire for reunification with the children, and the changes that respondent-mother was "making to maintain sobriety." The Durham Crisis Response Center records only contain a single reference to the issue of domestic violence, which appears in a set of case notes that are dated 18 June 2018. For that reason, we hold that the trial court's determination that the counseling that respondent-mother received at the Durham Crisis Response Center did not involve any particular focus upon issues relating to domestic violence had ample evidentiary support and that, even though the record might support a contrary decision, "this Court lacks the authority to reweigh the evidence that was before the trial court." *In re A.U.D.*, 373 N.C. at 12, 832 S.E.2d at 704; *see also In re Montgomery*, 311 N.C. 101, 110–11, 316 S.E.2d 246, 252–53 (1984) (stating that "our appellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary.")

Similarly, respondent-mother argues that the trial court erred by finding that there was a likelihood that the neglect that the children had experienced would be repeated in the event that they were returned to her care given that she had

demonstrated that there had been a marked change in her circumstances relating to the issue of domestic violence issues by the time of the termination hearing. In support of this contention, respondent-mother maintains that she had been able to show improvement in her situation as it relates to domestic violence by "refrain[ing]" from respondent-father, having been involved in no reported incident of domestic violence involving respondent-father for three years, obtaining a domestic violence assessment, and engaging in counseling at the Durham Crisis Response Center.

As we have previously indicated, the trial court did not err by finding that the counseling that respondent-mother had received at the Durham Crisis Response Center did not place any particular emphasis upon issues relating to domestic violence. In addition, the trial court acknowledged that there had been no reported incidents of domestic violence involving the parents since 2016 and that respondent-mother had obtained a domestic violence assessment in 2017. Even so, given respondent-mother's extensive history of participation in interpersonal relationships involving domestic violence and her failure to complete the recommended domestic violence counseling, the trial court could have reasonably concluded that respondent-mother had failed to express "meaningful insight about how domestic violence impacts them or could cause harm to their children." For that reason, we hold that the trial court did not err by determining that respondent-mother had failed to adequately address the issue of domestic violence by the time of the termination hearing and that its findings of fact with respect to this issue suffice to support its

determination that there was a likelihood of future neglect in the event that the children were returned to her care.

In light of our determination that the trial court's findings with respect to the issues of substance abuse and domestic violence suffice to show the existence of the required likelihood of future neglect in the event that the children were returned to respondent-mother's case, we need not address respondent-mother's challenge to the trial court's determination that she had failed to adequately address her mental health and housing problems. *See In re M.A.*, 374 N.C. at 870, 844 S.E.2d at 921 (holding that a parent's failure to adequately address the issue of domestic violence can be sufficient to support a determination that there is a likelihood of future neglect). In view of the fact that the trial court did not err by finding that respondent-mother's parental rights in the children were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1), that the existence of a single ground for termination will suffice to support the termination of a parent's parental rights in a child, *see In re A.R.A.*, 373 N.C. at 194, 835 S.E.2d at 421, and that respondent-mother has not challenged the trial court's determination that the termination of her parental rights would be in the children's best interests, we affirm the trial court's termination order with respect to respondent-mother as well.

AFFIRMED.