An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-400

Filed 4 March 2026

Cabarrus County, No. 22JT000155-120

IN RE: K.S.

Appeal by respondent-mother, and respondent-father from order entered 15 January 2025 by Judge Michael G. Knox in Cabarrus County District Court. Heard in the Court of Appeals 10 February 2026.

> *Reece & Reece, by Mary McCullers Reece, for the respondent-appellant-father.*
>
> *Ewing Law Firm, P.C., by Robert Ewing, for the respondent-appellant-mother.*
>
> *Hartsell & Williams, P.A., by Emily J. Arnold, for Cabarrus County DSS petitioner-appellee.*
>
> *Smith Anderson, L.L.P, by Amelia L. Serrat, for guardian ad litem.*

TYSON, Judge.

Respondent-Mother and Respondent-Father (collectively "Respondents") appeal from the trial court's order terminating parental rights to their minor child. We affirm.

## I.    Background

Six-month-old K.H. ("Kay") lived with Respondent-Mother and Respondent-Mother's boyfriend. *See* N.C. R. App. P. 42(b) (pseudonym used to protect the identity of the minor). On 27 June 2022, Cabarrus County Department of Human Services ("CCDHS") received a report which alleged Respondent-Mother and her boyfriend were involved in acts of domestic violence and were physically fighting and arguing in Kay's presence. The report further alleged Respondent-Mother's serious mental health issues had compromised her ability to care for Kay, and Respondent-Mother is the aggressor in the altercations with her boyfriend.

## A. Respondent-Mother

Respondent-Mother displayed aggressive and erratic behaviors. She had recently assaulted her stepmother with Kay and her other child present, left their residence in the middle of the night on foot with the children, and was picked up by the police and returned to her father's home. Respondent-Mother repeated this behavior the following day and brought the children to a stranger's home where she called a friend to drive from North Carolina to Alabama to pick them up. Respondent-Mother screamed she was going to kill herself, her father and the children. Respondent-Mother informed CCDHS she suffered from untreated mental health issues.

Respondent-Mother and her boyfriend entered into a safety plan with CCDHS and agreed to refrain from arguing, fighting or yelling in the presence of Kay and the other child. CCDHS advised Respondent-Mother to contact Daymark immediately

and obtain a mental health assessment.

A month later, on 28 July 2022, CCDHS received a second report which alleged a physical altercation had occurred in the home involving Respondent-Mother. After Respondent-Mother was interviewed by CCDHS regarding this incident, she moved with Kay into the home of her great aunt ("C.M.") in Stanly County. Stanly County Department of Human Services ("SCDHS") did not approve this placement for Kay due to C.M.'s past criminal history.

Respondent-Mother and Kay went to live with a family friend, also located in Stanly County. SCDHS worked with Respondent-Mother to develop a safety plan for Kay, which provided Respondent-Mother was not to return to her boyfriend's home, and was to refrain from any physical or verbal altercations in the presence of Kay.

On 16 August 2022, Respondent-Mother and the family friend had an altercation and Respondent-Mother took Kay and returned to C.M.'s home. C.M. contacted SCDHS because she was not an approved caretaker for the child. Respondent-Mother provided SCDHS with the names of three other potential placements for Kay, none of which were approved as appropriate. One of those was Respondent-Mother's godmother, whose name she did not know. Respondent-Mother did not propose any other potential caretakers for Kay. Respondent-Mother told CCDHS "she was a damn good mother because her child couldn't even walk yet but had four pairs of shoes."

On 19 August 2022, CCDHS filed a juvenile petition alleging Kay was a

neglected and dependent juvenile and obtained non-secure custody over her. The matter was heard before the trial court on 6 October 2022. Respondent-Mother stipulated Kay was a neglected and dependent juvenile.

The trial court ordered Respondent-Mother to comply with the following in order to remediate the issues which led to Kay's placement and to show a sustained behavior change: (1) complete a psychological evaluation with a CCDHS approved provider to determine her need for mental health services and follow recommendations; (2) complete an anger management assessment and follow recommendations; (3) complete a psychiatric evaluation to determine need for medication and report medication compliance to CCDHS; (4) attend an approved parenting course; (5) maintain suitable housing for herself and the child for at least six months; (6) provide verification she has sufficient income to care for the child; (7) follow a visitation plan; (8) contact the assigned social worker at least every other week regarding the status of the case and her progress with these tasks; and, (9) refrain from criminal activity.

Prior to the hearing, Respondent-Mother identified Respondent-Father as Kay's biological father and requested for him to complete genetic testing to determine paternity of Kay. Respondent-Father contacted CCDHS and stated he did not wish to complete paternity testing and did not believe he was Kay's biological father. The identity of Kay's father was unknown at the time of the adjudication hearing. The trial court ordered Respondent-Father to submit to a DNA paternity test. On 6

December 2022, results of the DNA testing confirmed Respondent-Father is Kay's biological father.

On 19 September 2022, CCDHS referred Respondent-Mother to Nazareth Child and Family Connection for a psychological evaluation. She failed to attend her scheduled appointment and never rescheduled it. Respondent-Mother obtained a psychiatric evaluation from Daymark Recovery Services on 20 February 2023, but she declined the recommended medication and did not seek alternative treatment. CCDHS referred Respondent-Mother to a provider for parenting services, but she did not attend any appointments or enroll in services.

Respondent-Mother stopped contacting DHS to inquire about Kay. She did not have stable housing at the time of the termination hearing and reported that she would stay with different friends for a few days at a time.

When the first Permanency Planning Hearing was held on 15 December 2022, the trial court found Respondent-Mother had attended six out of the nine scheduled visits with Kay. When the case was reviewed on 15 June 2023, Respondent-Mother had missed six out of twelve visits with Kay. Four of these missed visits were consecutive and resulted from Respondent-Mother's failure to confirm the scheduled visit with CCDHS. She commented she was "bored" during the visits and used her phone.

A third Permanency Planning Hearing was held on 26 October 2023. Respondent-Mother had only attended one visit with Kay in the previous five months.

She was yawning and did not interact much with Kay during the visit. The trial court found visitation with Respondent-Mother was no longer appropriate and suspended her visits with Kay. In the termination of parental rights order, the trial court found the last time Respondent-Mother had visited with Kay was on 3 July 2023, and Respondent-Mother does not inquire about the child's welfare or ask to see her.

### B. Respondent-Father

Respondent-Father entered into a case plan with CCDHS on 19 January 2023. He refused to participate until the tasks were court ordered. Following a Permanency Planning Hearing on 15 June 2023, the court ordered Respondent-Father to: (1) complete a mental health evaluation with an approved provider and comply with recommendations; (2) complete a parenting assessment through an approved provider and comply with recommendations; (3) complete a substance abuse assessment; (4) submit to random drug and alcohol screens; (5) complete an anger management assessment and comply with recommendations; (6) maintain appropriate housing for himself and the child for six consecutive months; (7) provide verification of sufficient income to provide for himself and the child; (8) provide financial support for the child; and, (9) contact the assigned social worker at least every other week regarding the status of the case and his progress in completing court-ordered tasks.

Respondent-Father completed his recommended twelve weeks of parenting classes with Daymark Recovery Services on 2 January 2024. He completed

recommended anger management sessions on 20 October 2023.

Respondent-Father also participated in an eight-week substance abuse recovery group. Respondent-Father continues to use marijuana and does not view his behavior as problematic. The last drug screen he submitted on 8 April 2024 tested positive for marijuana, and Respondent-Father has failed to comply with the eight drug screens requested since that date.

Respondent-Father was evicted from his housing on 1 July 2024. He reported that he was living at a hotel and in his grandmother's home in South Carolina. He informed CCDHS that he planned to sign a lease for a mobile home. As of the date of the termination of parental rights hearing, Respondent-Father had not provided CCDHS with an address and his housing situation was not known. He was employed at Wendy's. Respondent-Father was current on his $50.00 per month child support obligation at the time of the termination hearing.

Respondent-Father was initially consistent in attending visits with Kay. At the 15 June 2023 Permanency Planning Hearing, the court found his visitation with the child was appropriate. He brought her snacks and toys, changed her diaper, played with her, and encouraged her to walk and talk. He attended all eight of the offered visits between January and June of 2023. Respondent-Father's visits with Kay became inconsistent and sporadic. Beginning in June of 2023 he missed most of the visitation opportunities with Kay.

Following the 26 October 2023 hearing, the trial court changed the primary

goal from reunification with the parents to adoption. CCDHS filed a motion in the cause to terminate the parental rights of both parents on 25 March 2024. The matter came on for hearing before the trial court on 1 October 2024. The trial court found grounds existed to terminate Respondent-Mother's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), (2), (6) and (7). The trial court found grounds to terminate Respondent-Father's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), (2) and (6).

## II.    Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7B-1001(a)(3) (2025).

## III.    Standard of Review

This Court reviews a trial court's decision to terminate parental rights by examining "whether the court's findings of fact are supported by clear, cogent[,] and convincing evidence and whether the findings support the conclusions of law. Any unchallenged findings are deemed supported by competent evidence and are binding on appeal. The trial court's conclusions of law are reviewed *de novo*." *In re T.B.*, 380 N.C. 807, 812, 870 S.E.2d 119, 123 (2022) (citation omitted).

## IV.    Respondent-Mother's Issues

Respondent-Mother argues the trial court erred by: (1) finding and concluding grounds to terminate her parental rights exist for neglect under N.C. Gen. Stat. § 7B-1111(a)(1) and dependency under §7B-1111(a)(6), because Respondent-Mother had

identified an appropriate child care arrangement for Kay; (2) finding and concluding grounds to terminate her parental rights exist for willful abandonment under N.C. Gen. Stat. § 7B-1111(a)(7), because Respondent-Mother was not permitted to visit with Kay by court order; and (3) finding and concluding grounds to terminate her parental rights exist for willful failure to make reasonable progress under N.C. Gen. Stat. § 7B-1111(a)(2), because she could not participate in components of her case plan due to her severe mental health issues.

## V. Respondent-Father's Issues

Respondent-Father argues the trial court erred by: (1) finding and concluding grounds exist to terminate his parental rights for willful abandonment under N.C. Gen. Stat. § 7B-1111(a)(7), because CCDHS did not allege abandonment in the motion to terminate parental rights; (2) finding and concluding grounds exist to terminate his parental rights for dependency under N.C. Gen. Stat. § 7B-1111(a)(6), because the evidence failed to show Respondent-Father was incapable of providing proper care and supervision for Kay or lacked an appropriate alternative childcare arrangement; (3) finding and concluding grounds exist to terminate his parental rights for neglect under N.C. Gen. Stat. § 7B-1111(a)(1), because the evidence was insufficient to show he neglected Kay; and (4) findings of fact Numbers 11, 48, 50 and 52 were not supported by clear and convincing evidence, and some of the findings of fact were conclusions of law.

## VI. Neglect

Both parents argue the trial court erred by finding grounds to terminate their parental rights to Kay based upon neglect.

The trial court may terminate parental rights upon concluding the child is a neglected child within the meaning of N.C. Gen. Stat. § 7B-101. N.C. Gen. Stat. § 7B-1111(a)(1) (2025). A juvenile is "neglected" under the Juvenile Code when his or her parent, guardian, or caretaker "does not provide proper care, supervision, or discipline," "has abandoned the juvenile," or "creates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15)(a), (b) and (e) (2025).

"The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding." *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019) (quoting *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984)) (emphasis omitted). "[I]f the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citation omitted). "In such cases, a trial court may terminate parental rights based upon prior neglect of the juvenile if the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to [his or] her parents." *In re M.B.*, 382 N.C. 82, 86, 876 S.E.2d 260, 264 (2022) (citation omitted) (alteration in original) (emphasis omitted).

"When determining whether such future neglect is likely, the district court

must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. at 212, 835 S.E.2d at 430. The trial court may also consider "whether the parent has made any meaningful progress in eliminating the conditions that led to the removal of the child[]." *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265 (citations omitted). "[T]here is no requirement that the parent whose rights are subject to termination on the grounds of neglect be responsible for the prior adjudication of neglect." *In re M.S.L.*, 380 N.C. 778, 785, 869 S.E.2d 662, 666 (2022) "citation omitted."

## A. Respondent-Mother

Respondent-Mother has not challenged any of the trial court's findings of fact, which are binding upon appeal. *In re T.B.*, 380 N.C. at 812, 870 S.E.2d at 123 (citation omitted). Kay had remained in CCDHS' custody for twenty-five months at the time of the hearing. The court found Respondent-Mother had: failed to take steps to complete a psychological evaluation or parenting classes; refused the recommended medication for her mental health issues; had not obtained suitable housing for herself and Kay; failed to pay child support for Kay; visited with Kay infrequently before her visitation was ceased; and, stopped asking to see Kay or inquiring of CCDHS about the well-being of the child.

The trial court found the safety concerns which led to Kay's removal from Respondent-Mother's care "include but are not limited to, lack of parenting skills, lack of stable housing, and failure to address mental health/psychological needs."

Respondent-Mother failed to complete any of the aspects of her case plan to remediate the conditions, which led to Kay's removal, and to establish a safe and appropriate home for her. The trial court properly found and concluded Respondent-Mother is incapable of providing for the proper care and supervision of Kay, there is a reasonable probability such incapability will continue for the foreseeable future, and there is a high probability of repetition of neglect and dependency of Kay if she were to return to Respondent-Mother's custody "based upon [her] lack of commitment towards working on the case plan."

Respondent-Mother "has made [no] meaningful progress in eliminating the conditions that led to the removal of the child[]." *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265; *see also In re M.A.*, 374 N.C. 865, 870, 844 S.E.2d 916, 921 (2020) ("A parent's failure to make progress in completing a case plan is indicative of future neglect.") (citation omitted).

Respondent-Mother argues it was improper for the trial court to terminate her parental rights on the ground of neglect because she had identified C.M., the maternal great aunt, as an appropriate childcare arrangement for Kay. The trial court found:

> 6. On July 28, 2022, CCDSS initiated the case with the mother and the mother denied that the child was present and had conflicting stories as to who was involved in the altercation. When CCDSS left, mother went to Stanly County with [Kay] to stay at [C.M.], Maternal Great Aunt's home. Stanly County DSS worked with mother to develop a TSP but [C.M.] was denied due to criminal history. In

August of 2024 CCDSS completed another home study of C.M. which was approved and visits were begun.

7.    Mother identified . . . family friend, [D.H.], and developed a safety plan with Stanly County DSS including no[t] returning to boyfriend's home, no physical/verbal altercations in front of [Kay], and if there are altercations mother will remove [Kay] from [the] situation. On August 16, 2022, CCDSS was notified that mother got into [an] altercation with [D.H.] and left the home with [Kay]. Mother took [Kay] back to [C.M.'s] home and [C.M.] notified CCDSS to get the child because she was not approved. In August of 2024 CCDSS completed another home study of [C.M.] which was approved and visits began. [C.M.] has had visits with [Kay] on August 26, September 9, September 23 of 2024. The visits go really well. [C.M.] brings learning activities, clothes, snacks, breakfast, gives positive feedback, and praise, plays with her and [Kay] gives [C.M.] hugs during the visits. [C.M.] requested to be considered as a placement.

The findings that C.M.'s home was re-evaluated as a potential placement and approved less than two months before the termination of parental rights hearing does not negate or impact the court's findings and conclusions that there is "a showing of past neglect and a likelihood of future neglect by [Respondent-Mother]," *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167, and there "is a probability of repetition of neglect if the juvenile were returned to [his or] her parents." *In re M.B.*, 382 N.C. 86, 876 S.E.2d at 264. The trial court properly concluded grounds exist to terminate her parental rights for neglect under N.C. Gen. Stat. § 7B-1111(a)(1) (2025).

## B.  Respondent-Father

The trial court found Respondent-Father was compliant with aspects of his case

plan. He completed the recommended anger management sessions, parenting classes and substance abuse recovery group meetings. At the time of the termination hearing he was current on his child support obligation for Kay and was employed.

Although Respondent-Father did engage and participate in services and completed portions of his case plan, "a case plan is not just a checklist," and parents are "required to demonstrate acknowledgment and understanding of why the juvenile entered D[H]S custody as well as changed behaviors." *In re R.L.R.*, 381 N.C. 863, 875, 874 S.E.2d 579, 589 (2022) (citation and internal quotation marks omitted); *see also In re M.T.*, 285 N.C. App. 305, 332, 877 S.E.2d 732, 751 (2022) ("Parental compliance with a case plan alone is not always sufficient to preserve parental rights.").

The trial court found Respondent-Father reported daily marijuana use. He was sporadically compliant with drug screens for some time but failed to comply with any drug screening request after he tested positive for marijuana on 8 April 2024.

The trial court made the following finding with regard to Respondent-Father's visitation with Kay:

> 47. [Respondent-Father] was originally consistent with visitation when he became involved with the case. Since then, he has been sporadic in visitation. [Respondent-Father] attended all 8 offered visitations with [Kay] from January 2023 – June 2023. Visitation between [Respondent-Father] and [Kay] was reduced on October 26, 2023, due to [Respondent-Father] rarely attending visitation. [Respondent-Father] attended 2 of 9 visits from June 2023 – October 2023. [Respondent-Father] attended

visitations from November 2023 – February 2024. [Respondent-Father] requested that he should have more visitation time with [Kay]. Increased visitation was granted on March 7, 2024. [Respondent-Father] attended 1 out of 9 offered visits from March – July 2024. This was April 8, 2024. On April 23, 2024, CCD[H]S offered to increase [Respondent-Father's] visits to weekly visits. One week the visit would be at CCD[H]S and the other week the visit would be in [Respondent-Father's] home. This was dependent on if [Respondent-Father] could submit a negative drug screen or if his girlfriend could submit a negative drug screen, to see if there is a sober caretaker in the home. The girlfriend never engaged with CCD[H]S and [Respondent-Father] did not submit a drug screen after April 8, 2024. [Respondent-Father] would confirm that he would be at visits the Friday before his Monday visits and then on Monday morning would say he cannot make it due to him oversleeping, he had a flat tire, his car is overheating, or CCD[H]S would not hear from him. CCD[H]S had to request that [Respondent-Father] inform CCDSS on Monday mornings if he would make it to visitation because often [Kay] would be in the car for 1.5 hours without seeing her father. On July 11, 2024, it was ordered that [Respondent-Father's] visitations shall be ceased until [Respondent-Father] reaches out to the department with a plan for visits. CCD[H]S met with [Respondent-Father] on July 16, 2024 and it was determined that visits would resume on August 5, 2024 (bi-weekly on Monday mornings). This allowed [Respondent-Father] notice to arrange transportation. [Respondent-Father] reported transportation will not be a barrier after August 5, 2024. [Respondent-Father] asked for visits to be held at Stanly County DSS. This was denied due to SCDSS not allowing him back in their office due to his behaviors prior. Visits cannot be held in the community due to [Respondent-Father's] behavior. [Respondent-Father] attended his visit on August 4, 2024. [Respondent-Father] did not attend his visit on August 19, 2024. He stated he overslept, and he did not confirm. [Respondent-Father] attended the visit on September 3rd. [Respondent-Father] did not attend his visit on September 16, 2024, he stated

he got his days mixed up. [Respondent-Father] did not attend his visit on September 30, 2024, he confirmed and stated he was 5 minutes away at the start of the visitation. However, after 55 minutes, [Respondent-Father] was still not at the visit. His last visit was September 3, 2024. He attended 2 out of 5 visits offered since July 2024.

The trial court further found Respondent-Father was evicted in July 2024 and had not provided CCDHS any information regarding his housing status. He was not present at the termination of parental rights hearing.

The trial court made the following unchallenged finding of fact:

53. [Respondent-Mother] and [Respondent-Father] have abdicated their parental responsibilities and have not acted in a ma[nn]er consistent with their constitutionally protected status as parents. [Respondent-Father] did undertake to engage in a case plan and completed most of what was asked of him, however, he has been inconsistent in his engagement with the child, has not shown interest in being a parent to the child, and has not shown any demonstrations that he has or will implement what he has learned through the courses he took.

The evidence and unchallenged findings of fact show Respondent-Father was unwilling to establish a safe home for Kay. As the court stated in Finding of Fact Number 47 above, in April 2023, CCDHS attempted to establish visits with Kay in Respondent-Father's home on the condition that either he or his girlfriend submit negative drug screens to ensure the child would have sober caretakers.

Instead of submitting to the drug screens and increasing his time with Kay to bond with her and begin establishing a safe home for her, he stopped submitting to

all requested drug screens. *See In re Humphrey*, 156 N.C. App. 533, 540, 577 S.E.2d 421, 427 (2003) (holding the trial court did not err in terminating the mother's parental rights based on neglect where "[the mother] has wilfully [sic] refused to perform her obligations as a parent and has withheld her presence, love, care, and opportunity to display filial affection from the child").

Further, at the time of the hearing, Respondent-Father had submitted nothing to show he had housing for himself and Kay. The trial court correctly found Respondent-Father is "incapable of providing for the proper care and supervision of [Kay] and that such incapability will continue for the foreseeable future," that "there is a high probability of repetition of neglect and dependency" if Kay were returned to Respondent-Father, and it is likely such incapability will continue for the foreseeable future. Based upon the unchallenged findings of fact and conclusions of law, the trial court properly concluded grounds exist to terminate Respondent-Father's parental rights for neglect under N.C. Gen. Stat. § 7B-1111(a)(1).

**VII. Conclusion**

The trial court did not err in finding and concluding grounds exist to terminate Respondents parental rights based upon neglect. "[A]n adjudication of any single ground for terminating a parent's rights under N.C. Gen. Stat § 7B-1111(a) will suffice to support a termination order. . . . [I]f this Court upholds the trial court's order in which it concludes that a particular ground for termination exists, then we need not review any remaining grounds." *In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d

66, 71 (2020) (citations omitted). We need not review any of Respondents' other arguments regarding termination of parental rights under other prongs of N.C. Gen. Stat. § 7B-1111(a), because grounds for termination exist under N.C. Gen. Stat. § 7B-1111(a)(1). *Id.* The trial court's order terminating parental rights as to both parents is affirmed. *It is so ordered.*

AFFIRMED.

Judge ZACHARY and Judge HAMPSON concur.

Report per Rule 30(e).